630 F.2d 981
 57 A.L.R.Fed. 308
 The NATIONAL STATE BANK, ELIZABETH, N. J., a Banking
Corporation of the United States of America, and New Jersey
Bank (National Association), a Banking Corporation of the
United States of America, Appellants at No. 79-1823,
v.
Virginia LONG, Commissioner, Department of Banking, State of
New Jersey, Appellant at No. 79-1824.
 Nos. 79-1823, 79-1824.
 United States Court of Appeals,
Third Circuit.
 Argued June 10, 1980.
Decided Sept. 17, 1980.
 
 Alfred J. Lechner, Jr. (argued), Mackenzie, Welt, Duane & Lechner, Elizabeth, N. J., for The National State Bank, Elizabeth, N. J. and New Jersey Bank (National Association).
 Mark S. Rattner (argued), Deputy Atty. Gen., John J. Degnan, Atty. Gen., Michael E. Goldman, Deputy Atty. Gen., Stephen Skillman, Asst. Atty. Gen., State of New Jersey, Trenton, N. J., for Commissioner of Banking, State of New Jersey.
 Before GIBBONS, WEIS and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 "Redlining"-discrimination in the granting of home mortgages-is a matter of concern to both national and state government. This appeal presents the question whether national banks are subject to the provisions of a state antiredlining statute when federal legislation has covered some, but not all, of the field. The district court determined that insofar as a New Jersey statute required disclosure of mortgage statistics, it was preempted by the federal Home Mortgage Disclosure Act of 1975, 12 U.S.C. §§ 2801-2809 (1976). However the court also found that since federal legislation did not explicitly prohibit redlining, the antidiscrimination provision of the state statute was effective and could be enforced against national banks by state officials. We agree with the district court's determinations, except we hold that enforcement of the state statute is the responsibility of federal officials. With that modification, we affirm.
 
 
 2
 * In 1977 the New Jersey legislature enacted a statute, N.J.Stat.Ann. §§ 17:16F-1 to -11 (West Cum.Supp.1980), which (1) prohibits geographic discrimination, on an arbitrary or lending risk basis unsupported by reliable analysis, in granting, denying, or setting the terms of mortgages, id. § 17:16F-3; (2) requires depository institutions to compile and disclose to the public statistical information covering, among other items, the number and amount of mortgages originated or purchased annually and the locations of the properties, id. §§ 17:16F-4 to -6; (3) establishes a private right-of-action against institutions discriminating in violation of the Act, id. § 17:16F-7; (4) empowers the Commissioner, Department of Banking of New Jersey, to investigate, hold hearings, and issue subpoenas and cease and desist orders, id. §§ 17:16F-8 & -9; (5) authorizes the imposition of penalties for noncompliance, id. § 17:16F-10; and (6) provides that the Commissioner may adopt enforcement regulations consistent with the Act, id. § 17:16F-11.
 
 
 3
 The statute was designed to prohibit the arbitrary denial of mortgage loans on the basis of property location, to encourage the availability of mortgage capital for neighborhoods generally denied it, and to provide state officials with the information necessary to assess the statute's effectiveness. Id. § 17:16F-1. The legislation focused on the practice of restricting loans secured by mortgages on property in older or deteriorating areas; in the vernacular, "redlining"-marking off certain areas where mortgages will be given, if at all, only on more onerous terms.[1]
 
 
 4
 In 1977 the Commissioner adopted implementing regulations and notified all depository institutions doing business in the state, including national banks, of her intention to enforce them vigorously. The plaintiffs, National State Bank of Elizabeth, New Jersey and New Jersey Bank (National Association), sought declaratory and injunctive relief against the Commissioner, asserting that the New Jersey statute and regulations were unconstitutional. On cross motions for summary judgment, the United States District Court for the District of New Jersey held that the provisions of the statute prohibiting redlining were constitutional, but that the sections requiring banks to compile and disclose information, as well as those empowering the Commissioner to compel the production of other evidence, were preempted by the Home Mortgage Disclosure Act, insofar as the state sought to apply them to national banks. National State Bank v. Long, 469 F.Supp. 1068 (D.N.J.1979).[2]II
 
 
 5
 Congress enacted the Home Mortgage Disclosure Act in 1975 for the purpose of compiling information to determine whether depository institutions were "filling their obligations to serve the housing needs of the communities and neighborhoods in which they are located." 12 U.S.C. § 2801(b).[3] The information gathered also would assist public officials in distributing public sector investments so as to improve the private investment environment. Id. The Act authorized enforcement against national banks by the Comptroller of the Currency. Id. § 2804(b)(1)(A). Similar responsibility for the regulation of federal savings and loan institutions was given to the Federal Home Loan Bank Board. Id. § 2804(b)(2). The Act also provided that a state chartered depository institution could be exempted if state law imposed substantially similar requirements. Id. § 2805(b). Institutions in New Jersey were granted such an exemption.
 
 
 6
 Two other federal statutes, the Community Reinvestment Act of 1977, 12 U.S.C. §§ 2901-2905 (Supp. III 1979), and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f (1976), also were asserted to be relevant-the plaintiffs invoking the former, the defendant the latter. The Community Reinvestment Act requires the appropriate federal supervisory agency to assess an institution's record of meeting the credit needs of the entire community, including low and moderate income neighborhoods, 12 U.S.C. § 2903(1), and simultaneously to encourage the institution to do so, id. § 2901(b).
 
 
 7
 The federal agencies, including the Comptroller of the Currency, have adopted regulations implementing the Act. See Note, The Community Reinvestment Act Regulations: Another Attempt To Control Redlining, 28 Cath.U.L.Rev. 635, 638-39 (1979). With the information required by these regulations, the Comptroller may, but need not, deny an application for a deposit facility to a national bank that fails to meet the needs of its local community. 12 U.S.C. § 2903; see 12 C.F.R. § 25.8 (1980).
 
 
 8
 Like the Home Mortgage Disclosure Act and the Community Reinvestment Act, the Equal Credit Opportunity Act does not expressly prohibit redlining but bans discrimination based on race, color, religion, national origin, sex, marital status, age, the fact that the applicant's income is derived from public assistance, or the good faith exercise of any right thereunder. 15 U.S.C. § 1691(a). A private right-of-action is granted, id. § 1691e, and, if the same act or omission constitutes a violation of state law as well, the aggrieved party must elect to proceed under either federal or state law, id. § 1691d(e). The Equal Credit Opportunity Act, therefore, is an example of a situation where federal and state regulation co-exist. See id. § 1691d(f).
 
 
 9
 On appeal the plaintiffs also rely on the National Neighborhood Policy Act, 42 U.S.C. § 1441 (Supp. II 1978), and § 202(a) of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. § 57a(f) (1976 & Supp. III 1979).[4] The National Neighborhood Policy Act created the National Commission on Neighborhoods to investigate and study the factors contributing to the decline of city neighborhoods and the factors necessary to neighborhood survival and revitalization. Pub.L.No.95-24, § 204(a), 91 Stat. 57. The Commission fulfilled its responsibility to compile and submit a report to the Congress and the President, id. § 204(c), 91 Stat. 58, and, having done so, ceased to exist, id. § 208, 91 Stat. 59.
 
 
 10
 Pursuant to § 202(a) of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, the Comptroller of the Currency has established a Division of Consumer Affairs empowered to investigate and resolve consumer complaints about unfair or deceptive acts or practices by banks.
 
 
 11
 The plaintiffs assert that these statutes demonstrate Congress's intent to preempt all state redlining legislation insofar as national banks are concerned, and, therefore, the supremacy clause, U.S.Const. art. VI, cl. 2, invalidates the state's attempt to regulate them in any respect.
 
 III
 
 12
 In some instances, for example, regulation of the currency, congressional power to legislate in a given field is exclusive, and the states are prohibited from interfering. U.S.Const. art. I, §§ 8, cl. 5; 10, cl. 1. Usually, however, application of the supremacy clause to preemption questions depends upon congressional intent. Congress may choose to legislate, in areas within its competence, even though it treads upon matters already regulated by a state. Having chosen to act, Congress may decide to take over the entire field or perhaps only part. In some instances, federal legislation deliberately may overlap and even duplicate state enactments without supplanting them.
 
 
 13
 When congressional sentiment is not stated, the courts divine intent from available evidence. Federal legislation does not preempt a field traditionally within the state's police power unless that is the clear and manifest purpose of Congress. Rice v. Sante Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed.2d 1447 (1947). That purpose may be found if federal regulation is so pervasive there is no room for the state to supplement it. In other instances, federal law may touch a field in which the national interest is so dominant or the object sought and the obligations imposed are such that state enforcement on the same subject is assumed to be precluded. It also may be that state policy produces a result inconsistent with the aim of the federal statute. Id. Whether Congress has precluded state action altogether or has decided to devise measures that leave the state's police power in effect, except when exercised in a manner inconsistent with the federal legislation, "is often a perplexing question." Id. at 230-31, 67 S.Ct. at 1152.
 
 
 14
 Whatever may be the history of federal-state relations in other fields, regulation of banking has been one of dual control since the passage of the first National Bank Act in 1863. Act of Feb. 25, 1863, ch. 58, 12 Stat. 665 (repealed 1864) (current version at 12 U.S.C. §§ 21-215b (1976 & Supp. III 1979)). There is little doubt that in the exercise of its commerce power Congress could regulate national banks to the exclusion of state control. And unquestionably, as in other businesses, federal presence in the banking field has grown in recent times. But congressional support remains for dual regulation. In only a few instances has Congress explicitly preempted state regulation of national banks. More commonly, it has been left to the courts to delineate the proper boundaries of federal and state supervision.
 
 
 15
 The judicial test has been a tolerant one. As the Court explained in McClellan v. Chipman, 164 U.S. 347, 17 S.Ct. 85, 41 L.Ed. 461 (1896), "National banks . . . 'are governed in the daily course of business far more by the laws of the State than of the nation.' " Id. at 356, 17 S.Ct. at 87, quoting National Bank v. Commonwealth, 76 U.S. (9 Wall.) 353, 362, 19 L.Ed. 701 (1869). Their right to contract, collect debts, and acquire and transfer property are all based on state law. But a state's legislation cannot stand when it "conflicts with the laws of the United States, and either frustrates the purpose of the national legislation, or impairs the efficiencies of these agencies of the Federal government to discharge the duties for the performance of which they were created." Id. at 357, 17 S.Ct. at 87, quoting Davis v. Elmira Savings Bank, 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896). This test was reaffirmed in Anderson National Bank v. Luckett, 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944), where Chief Justice Stone wrote, "This Court has often pointed out that national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." Id. at 248, 64 S.Ct. at 607.[5]
 
 IV
 
 16
 * The Home Mortgage Disclosure Act does not expressly exempt national banks from state reporting and disclosure requirements, but the legislative history makes clear what the statute implies: federally chartered financial institutions are immune from these requirements.
 
 
 17
 The Senate bill, as originally passed, and the House bill, as introduced, would have subjected national banks to the reporting provisions of state law if the requirements were equal to or more stringent than those in the federal statute. See H.R.Rep.No.561, 94th Cong., 1st Sess. 19, reprinted in (1975) U.S.Code Cong. & Admin.News, pp. 2303, 2320-21; H.Conf.Rep.No.726, 94 Cong., 1st Sess. 9-10, reprinted in (1975) U.S.Code Cong. & Admin.News at 2336. However, before House passage, the bill was amended. See 121 Cong.Rec. 34563-64 (1975) (remarks of Rep. Stephens). At conference, the House delegation maintained that subjecting federally chartered institutions to state law would threaten the dual banking system. The Senate conferees acceded, "(w)ith the understanding that th(e) program goes only to the narrow area of geographical disclosure of mortgage lending statistics." H.Conf.Rep.No.726, 94th Cong., 1st Sess. 9-10, reprinted in (1975) U.S.Code Cong. & Admin.News at 2336. Thus, the Conference Committee adopted the House version, which reflected a decision to prevent the application of state disclosure laws to federally chartered institutions. Id.; see the discussion of the legislative history in Glen Ellyn Savings & Loan Assn. v. Tsoumas, 71 Ill.2d 493, 17 Ill.Dec. 811, 813, 377 N.E.2d 1, 3-4 (1978).
 
 
 18
 We therefore agree with the district court's conclusion that the Home Mortgage Disclosure Act superseded the reporting provisions of the New Jersey statute. It follows, too, that the enforcement provisions of the state statute as they pertained to the mortgage disclosure requirements also are invalid. Accordingly, §§ 4, 5, and 6 of the state act, N.J.Stat.Ann. §§ 17:16F-4 to -6, are unconstitutional in their entirety.
 
 B
 
 19
 The New Jersey Act contains more than mortgage statistical reporting requirements. In a clearly severable section, the statute also prohibits "redlining," defined in § 3 as discrimination "by intent or in effect, on a basis that is arbitrary or unsupported by a reasonable analysis of the lending risks associated with the applicant (or secured property) . . . merely because such property is located in a specific neighborhood or geographical area." N.J.Stat.Ann. § 17:16F-3(a).[6] The question presented is whether the federal acts relied on by the plaintiffs, none of which specifically prohibit redlining, disclose congressional intent to limit regulation in this area to disclosure only.
 
 
 20
 As noted earlier, the original versions of the House and Senate Home Mortgage Disclosure Act bills did not demonstrate an intention to limit regulation to the federal law, but rather to complement state action. In addition to the Conference Committee position set forth supra, Senator Proxmire, the floor manager, commented just before the Senate's favorable vote on the amended bill:
 
 
 21
 "Although it is my belief that in certain areas of consumer legislation it is always useful to let the States serve as laboratories and that we should not preempt more comprehensive State legislation, we did agree to the House (preemption) provision. We understand, however, that this language applied only to the Mortgage Disclosure provided in (the bill) and does not preempt States from taking action to promote reinvestment in other ways."
 
 
 22
 121 Cong.Rec. 40606 (1975). Thus the language of the Act itself and the comments of the Senate floor manager lead to the conclusion that preemption extended only to state requirements of mortgage information.
 
 
 23
 Since there is no expression of congressional intent with respect to redlining by national banks, we turn to the venerable but viable test of McClellan v. Chipman, supra. In doing so, we reject the plaintiffs' argument that once Congress legislates on a matter in the banking field, specific authorization must be given before supplementary state laws may take effect. See, e. g., 12 U.S.C. §§ 36(c) (establishment of branch banks), 85 (interest rates). As the Supreme Court recognized in Franklin National Bank v. New York, 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954), "Even in the absence of such express language, national banks may be subject to some state laws in the normal course of business if there is no conflict with federal law." Id. at 378 n.7, 74 S.Ct. at 554, citing Anderson and McClellan, supra. We find no conflict here.
 
 
 24
 As McClellan holds, national banks are subject to state law unless it (1) expressly conflicts with federal law, (2) frustrates the purpose for which national banks were created, or (3) impairs their efficiency to discharge the duties imposed upon them by federal law. None of the exceptions applies in the case of redlining. There is no express inconsistency, and, indeed, the philosophy inherent in the Equal Credit Opportunity Act would encourage recognition of the state effort.
 
 
 25
 The plaintiffs argue that Congress by its inaction intended to preempt state legislation and await further information before legislating on the redlining problem. We do not find this argument convincing. Redlining practices affect urban areas most heavily. What may be feasible or desirable in a more rural setting may not be effective in New Jersey. Hence, it is reasonable to assume that Congress preferred to give the states an opportunity to develop local solutions for local problems, at least in the first instance. Moreover, if state chartered institutions alone were prohibited from redlining, they would be encouraged to circumvent state law by applying for national bank charters, a development not particularly desired by Congress.[7]
 
 
 26
 We do not find that the aims of the federal banking system are frustrated. Nor are we convinced that the state statute impairs a bank's efficiency to discharge the duties imposed by federal law. National bank efforts to establish branch offices, a policy closely related to efficiency, are subject to state law, and there is no preemption concern. 12 U.S.C. § 36(c).[8]
 
 
 27
 It seems clear that none of the McClellan exceptions applies. Therefore, the substantive provisions of the antiredlining statute validly may be applied to national banks in New Jersey. This, however, does not end our inquiry.
 
 C
 
 28
 Questions about the applicability of state legislation to national banks must be distinguished from the related inquiry of who is responsible for enforcing national bank compliance. In analyzing the latter issue, we find that important federal interests take precedence over competing state concerns. Thus, we find ourselves unable to agree with the district court's determination that state officials have the power to issue cease and desist orders against national banks for violations of the antiredlining statute.
 
 
 29
 Congress has delegated enforcement of statutes and regulations against national banks to the Comptroller of the Currency. The Financial Institutions Supervisory Act of 1966, Pub.L.No.89-695, 80 Stat. 1028 (codified in scattered sections of 12 U.S.C.), provides that the appropriate federal banking agency may initiate cease and desist proceedings against any insured bank that violates "a law." 12 U.S.C. § 1818(b)(1). The legislative history of the Act indicates that Congress was concerned not only with federal but with state law as well, particularly as it might bear on corruption of bank officials or the financial stability of the institution. It may be that the word "law" as used in the statute is not all encompassing and may exclude matters of purely local concern. However, when state law prohibits the practice of redlining, its enforcement so directly implicates concerns in the banking field that the appropriate federal regulatory agency has jurisdiction.
 
 
 30
 It is reasonable to assume that enforcement against redlining in a particular instance involves consideration of "a reasonable analysis of the lending risks associated with the applicant" or the "condition of the property," as the New Jersey Statute phrases it, § 17:16F-3(a), and, thus, does have some relationship to the banks' financial stability. Moreover, although the Community Reinvestment Act does not expressly prohibit redlining, regulations promulgated by the Comptroller of the Currency state that in passing upon applications for depositories, evidence of prohibitive discriminatory or other illegal credit practices will be considered. 12 C.F.R. § 25.7(f) (1980). Thus, federal interest subject to enforcement by the Comptroller are present in the cease and desist measures of the New Jersey Statute. We therefore have no difficulty concluding that enforcement of the antiredlining law is within the scope of the Financial Institution Supervisory Act. See Rohner, Problems of Federalism in the Regulation of Consumer Financial Services Offered by Commercial Banks, 29 Cath.U.L.Rev. 1, 16 (1979). The question then is whether the jurisdiction conferred is exclusive.[9]
 
 
 31
 The requirements imposed on national banks by the Home Mortgage Disclosure Act and the Community Reinvestment Act are closely allied with the state's flat prohibition against redlining. The regulations enacted by the Comptroller supplementing those two acts serve to further the interests of uniformity and national application. To allow enforcement of the anti-redlining provisions by state officials with accompanying variations on the federal disclosure requirements simply would result in unnecessary and wasteful duplication of effort on the part of the bank and the state agency. From that standpoint enforcement exclusivity in the federal agency is reasonable and practical.
 
 
 32
 In addition, the Federal Reserve Act of 1913, 12 U.S.C. §§ 221-522 (1976 & Supp. III 1979), provides that no bank is subject to visitorial powers other than as authorized by law or vested in courts or as directed by Congress. 12 U.S.C. § 484.[10] The Comptroller has issued an interpretive ruling that visitorial power over national banks is vested in him and state banking officials have no authority to inspect or require production of bank records except as authorized by law. 12 C.F.R. § 7.6025(b) (1980). Consistent with this approach is another section of the Federal Reserve Act, 12 U.S.C. § 481, authorizing examination of banks by the Comptroller.
 
 
 33
 It is not clear just what "visitorial" powers include, although generally they do encompass examination of the bank's books and records. A few notable exceptions are that a stockholder of the bank may inspect its records to determine the value of the stock, Guthrie v. Harkness, 199 U.S. 148, 157-59, 26 S.Ct. 4, 7, 50 L.Ed. 130 (1905), and the Securities and Exchange Commission and the Federal Trade Commission likewise may investigate bank records for matters within those agencies' purview, Peoples Bank of Danville v. Williams, 449 F.Supp. 254, 158-60 (D.Va.1978); FTC v. Rockefeller, 441 F.Supp. 234, 243 (S.D.N.Y.1977), aff'd, 591 F.2d 182 (2d Cir. 1979). Enforcement of the antiredlining statute no doubt would require examination of bank records. We need not meet the Comptroller's interpretative ruling in all respects but, in the circumstances of this case, exclusivity of the power to examine is a reasonable interpretation of the National Bank Act.
 
 
 34
 Our conclusion is consistent with the decision of the United States Court of Appeals for the Ninth Circuit in Conference of Federal Savings And Loan Associations v. Stein, 604 F.2d 1256 (9th Cir.), aff'd mem., 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1979). In Stein a group of federal savings and loan associations challenged the authority of California to regulate and discipline them in the antiredlining area. The plaintiffs did not challenge the substantive nondiscrimination provisions of the state's statute; the dispute involved only the procedural aspects of the law-those providing for regulatory control over the plaintiffs to insure that the law's substantive guarantees were respected. These included provisions for compliance monitoring, as well as the enforcement and complaint resolution mechanism. The court held that the control of the Federal Home Loan Bank Board over federal savings and loan associations "is so pervasive as to leave no room for state regulatory control. . . . If state-conferred rights are to be enforced against federal associations by any regulatory body (a question we do not reach), enforcement must be by the Bank Board." 604 F.2d at 1260.
 
 
 35
 We recognize that federal regulation of federal savings and loan associations, which dates to 1933, is distinct from the supervision of national banks by the Comptroller of the Currency and that, unlike the Comptroller, the Federal Home Loan Bank Board has promulgated comprehensive antidiscrimination regulations, 12 C.F.R. §§ 528.1-.8 (1980). We also acknowledge that federal savings and loan associations do not have the lengthy history of dual regulation that characterizes the national banking system. Nevertheless, we believe that the federal interests implicated in the two situations are sufficiently similar to warrant like results.
 
 
 36
 Thus, while the substantive law of New Jersey prohibiting redlining is not preempted, enforcement of the state statute is the responsibility of the Comptroller of the Currency rather than the State Commissioner. We, therefore, hold that §§ 9 and 10 of the New Jersey Act, N.J.Stat.Ann. §§ 17:16F-9 &-10, are invalid along with §§ 4, 5, and 6.
 
 
 37
 Accordingly, the judgment of the district court will be affirmed, except with respect to §§ 9 and 10, and the judgment will be modified to hold those two sections invalid as well.
 
 
 
 [1]
 Section 17:16F-3 reads as follows:
 "a. No depository institution shall discriminate by intent or in effect, on a basis that is arbitrary or unsupported by a reasonable analysis of the lending risks associated with the applicant for a given loan or the condition of the property to secure it, in the accepting of applications, granting, withholding, extending, modifying or renewing, or in the fixing of the rates, terms, conditions, or provisions of any mortgage loan on real property located in the municipality in which a depository institution has a home or branch office, or in any municipality contiguous to such municipality, merely because such property is located in a specific neighborhood or geographical area; provided, however, that it shall not be a violation of this section if the mortgage loan is made pursuant to a specific public or private program, the purpose of which is to increase the availability of mortgage loans within a specific neighborhood or geographical area."
 The language "by intent or in effect" and "accepting of applications" was added by amendment after the district court handed down its decision. Also added was subparagraph b:
 "b. No depository institution may discourage, or refuse to allow, receive, or consider, any application, request, or inquiry regarding a mortgage loan, or discriminate in imposing conditions upon, or in processing, any such application, request, or inquiry on any basis prohibited by law."
 
 
 [2]
 The district court did not immediately rule on the validity of the state regulations, in order to give the parties an opportunity to confer. Later, it issued a supplemental opinion that declared unconstitutional, as applied to the plaintiffs, all regulations that touched upon disclosure. 469 F.Supp. 1078
 After the district court entered judgment, the Commissioner amended the regulations to exempt national banks from the disclosure and filing provisions of the state statute, N.J.A.C. § 3:1-9.3(D) (1980), and to restrict her investigative and enforcement powers over national banks, id. §§ .10(A), .10(C), .11(A)(2), .19(A). Those amendments were voluntarily made to comply with the order of the district court and do not moot this case. The voluntary cessation of allegedly illegal conduct does not make a case moot unless it is absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur. SEC v. Medical Comm. for Human Rights, 404 U.S. 403, 406, 92 S.Ct. 577, 579, 30 L.Ed.2d 560 (1972). The Commissioner has explained that should she prevail in her cross-appeal, the amended regulations will be revoked and the original regulations reinstated.
 
 
 [3]
 The Act expired by it own terms on June 28, 1980. 12 U.S.C. § 2809. Legislation to reenact it is pending. See H.R. 7059 & 7060, 96th Cong., 2d Sess. (1980), reprinted in Home Mortgage Disclosure Act Extension Amendments: Hearings on H.R. 7059 & 7060 before the Subcomm. on Financial Institutions Supervision, Regulation and Insurance, 96th Cong., 2d Sess. 3-10 (1980); S. 2719, 96th Cong., 2d Sess., 126 Cong.Rec. S7744-59 (daily ed. June 21, 1980). This case is not moot, however. If the statute's provisions on reporting superseded state law, the plaintiffs will not have to file statistical information compiled prior to the expiration date
 
 
 [4]
 Although the plaintiffs did not rely upon the statutes in the district court, we have decided to consider them here
 
 
 [5]
 See the discussion in Scott, The Patchwork Quilt: State and Federal Roles in Bank Regulation, 32 Stan.L.Rev. 687, 690-95 (1980)
 
 
 [6]
 Section 17:16F-3 is set forth in full at note 1 supra
 
 
 [7]
 See Note, The Home Mortgage Disclosure Act of 1975: Will It Protect Urban Consumers From Redlining? 12 New England L.Rev. 957, 977 & n.90 (1977); Scott, supra note 5, at 693
 
 
 [8]
 See, Bettauer, Federal and State Anti-redlining Laws: Must National Banks Comply With Both?, 97 Banking L.J. 329, 339 (1980) ("to the extent state substantive anti-redlining laws are compatible with the enforcement of the federal fair lending schemes and do not pose unacceptable credit risks for the institutions involved, the Comptroller has recommended that the national banks observe the state standards.")
 
 
 [9]
 See Rohner, supra at 18 (the Comptroller of the Currency "has now publicly acknowledged (his) responsibility to enforce state laws and has begun a process of gathering and identifying those laws."). Bettauer, supra note 8, at 343 n.45 ("Also the Comptroller's office with its complaint investigation and resolution procedures is prepared and able to fully exercise the necessary enforcement of applicable state anti-redlining laws.")
 
 
 [10]
 Section 484 derives almost unchanged from § 54 of the National Bank Act of 1864. Act of June 3, 1864, ch. 106, 13 Stat. 99 (current version at 12 U.S.C. §§ 21-215b (1976 & Supp. III 1979))