CONFERENCE OF STATE BANK SUPERVISORS, Appellant,

v.

C. Todd CONOVER, Comptroller of the Currency of the United States.

No. 82–1303.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1982.

Decided June 30, 1983.

As Amended July 7, 1983.

Arthur E. Wilmarth, Jr., Washington, D.C., with whom James F. Bell and John A. Buchman, Washington, D.C., were on the brief, for appellant.

Dina R. Lassow, Atty., U.S. Dept. of Justice, with whom Stanley S. Harris, U.S. Atty., Anthony J. Steinmeyer, Atty., U.S. Dept. of Justice, Ronald R. Glancz and L.

Robert Griffin, Attys., Office of the Comptroller of the Currency, Washington, D.C., were on the brief, for appellee.

Arnold M. Lerman, David R. Johnson and Daniel M. Drory, Washington, D.C., were on the brief for American Nat. Trust and Sav. Ass'n, et al., amici curiae urging affirmance.

Before ROBINSON, Chief Judge, WILKEY, Circuit Judge, and MacKINNON, Senior Circuit Judge.

Opinion for the Court PER CURIAM.

PER CURIAM:

Appellant Conference of State Bank Supervisors (the Conference) sought a declaratory judgment that regulations promulgated by the Comptroller of the Currency (the Comptroller) establishing the terms on which national banks may offer or purchase adjustable-rate mortgages (ARMs) are invalid to the extent they purport to preempt inconsistent state laws. The district court granted the Comptroller's motion for summary judgment on the ground that the challenged regulations fall within the scope of powers granted by Congress under two different acts. The Conference appeals and we affirm.

I.

The essential feature of an adjustable-rate mortgage is that the interest rate may be adjusted periodically to reflect changes in prevailing rates. The Comptroller's regulations at issue here provide that all *national* banks may offer or purchase ARMs subject to various conditions relating to the permissible amount of each increase in interest, the frequency of increases, the maximum overall interest increase, and other matters. Adjustable-Rate Mortgages, 46 Fed.Reg. 18,932 (1981) (to be codified at 12 C.F.R. pt. 29) (JA 37–39).[1] The Comptroller described the regulations as intended to "encourage national bank participation in the residential mortgage market by facilitating the development of new mortgage instruments . . . ." *Id.* at 18,934, col. 1 (JA 28).

A number of states, however, have established restrictions on ARMs that conflict with the Comptroller's regulations in various respects. Believing that these state restrictions have the effect of discouraging national banks from offering ARMs, the Comptroller determined that his regulations should override inconsistent state law. *Id.* at 18,942, col. 2 (JA 36). The regulations provide generally that national banks may offer ARMs without regard to any limitations imposed by state law. In addition, the regulations preempt state laws that prohibit the charging of interest on interest and prepayment fees and that impair the enforceability of due-on-sale clauses.[2]

The Conference is an association composed of state government officials who are responsible for regulating *state* banks. It brought a prompt declaratory judgment action challenging the Comptroller's authority to preempt inconsistent state laws. Since it was undisputed that the banking laws conflict with the Comptroller's regulations, the only question upon which issue was joined was "whether these regulations are within the scope of the Comptroller's powers granted by Congress."[3] *Conference*

1. Citations to the Joint Appendix are designated by "JA."

2. 12 C.F.R. Ch. I was amended by adding a new Part 29, which provides:

National banks may make or purchase adjustable-rate mortgage loans pursuant to this Part without regard to any limitations that otherwise would be imposed on adjustable-rate mortgage lending by the laws of any State, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, or Guam, which limitations are hereby expressly preempted.

46 Fed.Reg. at 18,943, col. 1–2 (to be codified at 12 C.F.R. § 29.3) (JA 37). Specific provisions preempting state laws are embodied in other subsections of the final rule. *See id.* at 18,944, col. 1 (to be codified at 12 C.F.R. § 29.5(d)(1)) (JA 38); *id.* (to be codified at 12 C.F.R. § 29.6) (JA 38); *id.,* col. 1–2 (to be codified at 12 C.F.R. § 29.7) (JA 38).

3. The Comptroller also raised the threshold issue of whether the Conference has standing, but the court ruled that it did. *Id.* at 695–96 (JA 57–58). We agree that appellant has

*of State Bank Supervisors v. Lord,* 532 F.Supp. 694, 696 (D.D.C.1982) (JA 58). The court considered the question on cross-motions for summary judgment and the parties' written oppositions thereto.

The court accepted both alternative bases offered by the Comptroller as conferring the requisite rulemaking authority. First, the Comptroller relied on the rule-making power conferred by 12 U.S.C. § 371(g), which was enacted as part of the Housing and Community Development Act of 1974, Pub.L. No. 93–383, 88 Stat. 633 (1974). Section 371(g) provided:

> Loans made pursuant to this section shall be subject to such conditions and limitations as the Comptroller of the Currency ·may prescribe by rule or regulation.[4]

Viewing the purpose of the Act as the authorization of wider real estate lending powers for national banks, *see* H.R.Rep. No. 1114, 93d Cong., 2d Sess. 44 (1974), the court reasoned that since ARMs are "real estate" loans within the meaning of 12 U.S.C. § 371(a), and the challenged regulations establish "conditions and limitations" on such loans, the Comptroller was authorized to issue the regulations under section 371(g).

Second, the court held that the Comptroller had an independent statutory basis for issuing the regulations under 12 U.S.C. § 93a, which was enacted as section 708 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDM-CA), Pub.L. No. 96–221, 94 Stat. 132 (1980). Section 93a provides:

> Except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to another regulatory agency, the Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office, except that the authority conferred by this section does not apply to section 36 of this title

[*i.e.,* the McFadden Act, which makes the power of national banks to branch subject to *state* law] or to securities activities of the National Banks under the Act commonly known as the "Glass-Steagall Act." The court reasoned that the Comptroller's responsibility to ensure the safety and soundness of the national banking system under 12 U.S.C. § 481, and to carry out those provisions of federal banking law that authorize national banks to offer real estate loans, provided him with the broad authority to issue the challenged regulations.

## II.

Not surprisingly, the Conference challenges both alleged bases of the Comptroller's authority. Before reaching these questions of statutory intent, however, we consider the effect of the Supreme Court's recent decision in *Fidelity Federal Savings & Loan Association v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Our conclusion follows inexorably from the reasoning of the majority in *Fidelity.*

*Fidelity* upheld the preemptive effect of a Federal Home Loan Bank Board regulation which permitted federal savings and loan associations to enforce due-on-sale clauses of mortgages notwithstanding inconsistent state laws. Although *Fidelity* is factually similar to the instant appeal, appellant seeks to distinguish the case on two grounds: (1) that the decision does not dispose of appellant's contention that courts must apply "strict scrutiny" when reviewing preemption claims, and (2) that *Fidelity* is inapposite because of the dual nature of the American banking system.

### A. *The Standard of Review.*

■ The preemption doctrine requires us to examine congressional intent, which may be express or implied. The Supremacy

standing under *Nuesse v. Camp,* 385 F.2d 694 (D.C.Cir.1967).

4. This statute was superseded by the Garn-St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1469 (1982) (to be effective April 14, 1983). This opinion is relevant only to the period prior to passage of the Garn-St. Germain Act and covers transactions made prior thereto. The parties concede, and we agree, that this action has not been mooted by passage of the Garn-St. Germain Act.

Clause is triggered "'whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Id.* 102 S.Ct. at 3022 (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Neither party disputes these fundamental principles, but appellant insists that a "presumption against federal *administrative* preemption of state law" should apply. Brief for Appellant at 1 (emphasis added). The Conference describes this putative "presumption" as entailing the application of "*a strict standard of scrutiny which requires persuasive evidence* of an express or implied congressional intent contemplating preemption of state law." Appellant's Reply Brief at 14 (emphasis added). Appellant's argument is voiced sometimes as a "presumption" that can only be overcome by more "persuasive evidence," and other times as a requirement that the statute conferring rulemaking power must contain a *specific* grant of "preemptive authority." *See* Brief for Appellant at 12–13, 27–33, 49. Neither is convincing.

■ Appellant's assertion that a presumption runs against preemption cannot be supported, even in cases where preemption is accomplished through regulation. As *amici* have demonstrated, *see* Brief for Amici Curiae at 12–14, the authorities upon which appellant relies to support this proposition are cases that *construe* the relevant state and federal laws to determine whether there actually is a conflict between them. *See, e.g., Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981); *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). In the construction of such laws, courts indulge a rule of construction (not a presumption) which avoids finding a conflict if

at all possible. But here the conflict is undisputed. *See* Brief for Appellant at 6 ("The challenged regulations conflict with the applicable laws of a number of states ...."). Consequently, the "presumption" inquiry is not relevant here, for the only question before us is whether admittedly conflicting regulations are valid.

■ Appellant at times also contends that a regulation—however valid in other respects—cannot preempt state law unless there is "persuasive evidence" that Congress specifically intended to grant regulatory authority to preempt. But the Supreme Court ruled adversely upon the requirement for a special inquiry in *Fidelity.* In upholding the Federal Home Loan Bank Board's preemptive regulation, the Court considered the showing of congressional intent that must be made in order to find preemptive effect in a federal statute or regulation. The California Court of Appeals determined that Congress had not expressed an intent to preempt state due-on-sale laws, and that court refused to "'equate the *Board's* expression of intent with the requisite *congressional* intent.'" 102 S.Ct. at 3020 (quoting 121 Cal.App.3d 328, 339, 175 Cal.Rptr. 467, 474 (1981) (emphasis in original)). The Supreme Court rejected as "misdirected" this "narrow focus on Congress' intent to supersede state law."[5] 102 S.Ct. at 3023. Rather, the Court reasoned,

> [f]ederal regulations have no less preemptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review *only to determine whether he has exceeded his authority or acted arbitrarily.* United States v. Shimer, 367 U.S. 374, 381–382 [81 S.Ct. 1554, 1559–1560, 6 L.Ed.2d 908] (1961). When the administrator promul-

---

**5.** Appellant attempts to minimize the Court's decision to eschew a "narrow focus on ... intent to supersede state law" by maintaining that the Court was rejecting a requirement by the California court that "preemptive authority" be *expressly* authorized. Appellant's Reply Brief at 12 n. 9. This contention cannot be supported. A reading of the California court's opinion clearly indicates, as the language of the

Supreme Court's opinion suggests, that the lower court did not insist on express bestowal of preemptive authority; implied bestowal would have sufficed. *See* 121 Cal.App.3d at 335–336, 175 Cal.Rptr. at 470–71. Therefore, the Supreme Court must have been rejecting the narrow focus of an inquiry directed at intent to bestow preemptive authority.

gates regulations intended to pre-empt state law, the court's inquiry is similarly limited:

"If [h]is choice represents a reasonable accommodation of conflicting policies ·that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.,* at 383 [81 S.Ct. at 1560] . . . .

*Id.* 102 S.Ct. at 3022 .(emphasis added). Clearly, the Court ruled that no further inquiry into ·intent to bestow preemptive authority is required. The preemption analysis need ask only two questions: (1) was the Comptroller's choice a "reasonable accommodation of conflicting policies" committed to his care, and (2) were the regulations within his statutory authority. The Conference does not contest the reasonableness of the regulations. As to the second question, if the regulations would *otherwise* be valid, their preemptive effect does not invalidate them *unless* Congress has expressed, either explicitly or implicitly, an intent that preemption is *not* within the Comptroller's power.

The Conference points out, however, that the *Fidelity* Court found that Congress "plainly indicated that the Board need not feel bound by existing state law." *Id.* 102 S.Ct. at 3027. On the strength of this finding, appellant maintains that "[n]othing in the Court's decision suggests that *no* evidence of congressional intent is needed to authorize a preemptive regulation." Appellant's Reply Brief at 12 n. 9 (emphasis in original). This conclusion is unsupportable. In seeking evidence that the Board had not exceeded its authority, the Court did find evidence that Congress had also contemplated and approved the possibility that the Board might promulgate regulations that would preempt state laws. But at most that finding reduces to dicta Part II of the Court's opinion, which commanded the votes of six Justices.[6] It does not permit this court to ignore the dictum, if such it be.

There need be no finding, therefore, that Congress specifically intended—either explicitly or implicitly—to bestow preemptive authority.

B. *The Dual Nature of the Banking System.*

■ Appellant contends that unlike *Fidelity,* which concerned *savings and loan institutions,* the present case involves national *banks,* to which federal courts have consistently held that state laws are applicable insofar as their real estate lending activities are concerned. Appellant's Reply Brief at 16–22. But all of the cases cited by appellant involved the application of state law in the *absence* of federal regulation, where the supremacy clause had not been triggered. For example, in *National State Bank v. Long,* 630 F.2d 981 (3d Cir.1980), upon which appellant places much reliance to buttress its "dual-nature" argument, the court found that a state anti-redlining law was applicable to national banks because it did not conflict with federal law and would promote non-discriminatory lending, a goal already supported by Congress. The result in *Long*—particularly after *Fidelity*—would not have been the same had the Comptroller not acquiesced in the anti-redlining law by failing to promulgate a regulation preempting such laws. The line of cases appellant strings together to support its position stand only for the much narrower proposition that state laws are generally applicable to national banks only to the extent they do not conflict with federal law, whether statutory or administrative.

Therefore, *Fidelity* does apply to the present case, and the reviewing court may not disturb the Comptroller's " 'reasonable accommodation of conflicting policies . . . unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' " 102 S.Ct. at 3022 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

6. Justice Powell did not participate in the consideration or decision in the case. 102 S.Ct. at 3031.

## III.

### A. Section 371(g).

As noted above, after this appeal was filed, section 371 was amended by section 403 of the Garn-St. Germain Depository Institutions Act of 1982. *See* note 4 *supra.* The amendment strikes the terms of section 371 and replaces them with a provision enabling national banks to make real estate loans "subject to such terms, conditions, and limitations as may be prescribed by the Comptroller of the Currency by order, rule or regulations." *Id.* § 403(a). This language is not substantially different from that in section 371(g), although the legislative history and the statutory setting differ. As appellant concedes, Appellant's Reply Brief at 23–24 & n. 23; Appellant's Letter to the Clerk (Oct. 18, 1982), section 403 indisputably grants the Comptroller, as of April 14, 1983, the substantive rulemaking authority he claimed in promulgating the regulations at issue in this appeal. Moreover, Title VIII of the new Act authorizes *state* lenders to issue mortgages in accordance with federal regulations, and it expressly proposes thereby to "eliminate the discriminatory impact" on state lenders of, *inter alia,* the regulations here in dispute. *See* section 802(a)(3) and (b). Consequently, this entire appeal is moot except to the extent it affects lending activities of national banks after promulgation of the regulations (March 27, 1981) and before the effective date of the new Act (April 14, 1983).

At the same time, the old maxim that the views of one Congress ordinarily have no legal bearing on the legislative intent of another should not be ignored. It is undetermined whether section 403 was enacted in order to grant *new* authority or to clarify beyond cavil *preexisting* authority to issue the challenged regulations. In any event, we are convinced that the Comptroller had the requisite authority to issue the regulations before section 371 was amended.

Appellant offers two main arguments in support of its contention that the unamend-

ed version of section 371 does not authorize the Comptroller's preemptive regulations. First, the Conference maintains that the language and legislative history of section 371 indicate the Comptroller is permitted only to impose *"conditions and limitations"* on the lending powers of national banks, not to issue rules that would *expand* those powers. The short answer to this argument, as the Comptroller notes, is that permitting national banks to offer ARMs is not a *new* power at all. Brief for Appellee at 24–27. National banks could offer ARMs before the promulgation of these regulations. Appellant confuses the banks' preexisting power to offer new lending instruments with the Comptroller's power to preempt state laws where he concludes that they conflict with his duty to assure that national banks play an active role in extending credit to home-buyers. It is significant that, in its selective recapitulation of the legislative history of section 371, appellant omits the following sentence from the report by the House Committee on Banking and Currency:

> The primary purpose of this provision is to improve and update the mortgage investment tools of national banks to assist them in their efforts to respond to the demands of the real estate industry.

H.R.Rep. No. 93–1114, 93d Cong., 2d Sess. 44 (1974). This clearly authorizes the Comptroller to regulate the terms and conditions of mortgages.

Second, appellant contends that Congress adopted section 371 in order to preserve "competitive equality" between the state and national banking systems. Since these regulations place state banks at a disadvantage vis à vis national banks in those states that regulate ARMs more restrictively than do the new federal regulations, the regulations will frustrate the congressional goal of achieving "parity." But this argument never gets beyond its faulty premise.

Appellant quotes the same House Committee report (and omits the sentence quoted above, notwithstanding that it immediately precedes the passage appellant relies on), which explains that "[t]he addition of these provisions would place national banks

on a par with state chartered commercial banks *and other financial institutions." Id.* (emphasis added). But the argument is a non sequitur; a congressional decision to upgrade the powers of national banks because they were at a competitive disadvantage does not entail the altogether different proposition that Congress intended to compel national banks to move in lockstep with state banks. Moreover, as the Comptroller notes, the very fact that congressional action was necessary "to place national banks on a par" with state institutions shows that equality is not contemplated by section 371. If national banks had been governed by state law before section 371 was enacted, the scope of their lending activities would have *matched* those of state institutions and no federal legislation would have been required.

Finally, the inclusion of "other financial institutions" in the quoted passage compels the conclusion that Congress did not intend to codify the rigid "parity" appellant suggests, for this phrase also embraces savings and loan associations, whose governance by preemptive federal regulations the Supreme Court has already sanctioned in *Fidelity.* Appellant's position, therefore, squarely contradicts the decision in *Fidelity.*

We conclude that section 371(g) confers authority to promulgate these regulations.

### B. *Section 93a.*

██ This section also provides statutory authority for issuing the ARM regulations. Appellant denigrates this provision as a grant of authority to issue only "housekeeping" procedural regulations, but this argument is unconvincing. Appellant quotes a remark by Senator Proxmire (who was floor manager of the bill that added this provision) in which he assured the Senate that section 93a "carries with it no new authority to confer on national banks powers which they do not have under existing law." Brief for Appellant at 50–51 (quoting 126 Cong.Rec. S. 3172 (daily ed. March 27, 1980)). But as we have already noted, these regulations do *not* confer any new powers on national banks, since the Act imposed no restrictions on ARMs. Rather, the regulations control the terms under which banks may offer ARMs. That the Comptroller also saw fit to preempt those state laws that conflict with his responsibility to ensure the safety and soundness of the national banking system, *see* 12 U.S.C. § 481, does not constitute an expansion of the powers of national *banks.*

Similarly, appellant's recitation of other scattered bits of legislative history does not support the proposition that section 93a can form no basis for the challenged regulations. In every instance, the proffered legislative materials contain statements that the section grants no new substantive powers to *banks.* For example, appellant quotes from the conference report on DIDMCA, which stated that section 93a "carries no authority [enabling the Comptroller] to permit otherwise impermissible activities *of national banks* with specific reference to the provisions of the McFadden Act and the Glass-Steagall Act." H.R.Rep. No. 842, 96th Cong., 2d Sess. 83 (1980) (emphasis added), U.S.Code Cong. & Admin. News 1980, pp. 236, 313 (quoted in Appellant's Reply Brief at 33 n. 40). Furthermore, as the "specific reference" to the McFadden and Glass-Steagall Acts indicates, the "impermissible activities" which the Comptroller is not empowered to permit are activities that are impermissible under federal, not state, law. It bears repeating that the entire legislative scheme is one that contemplates the operation of state law only in the absence of federal law and where such state law does not conflict with the policies of the National Banking Act. So long as he does not authorize activities that run afoul of federal laws governing the activities of the national banks, therefore, the Comptroller has the power to preempt inconsistent state law.

### IV.

For the foregoing reasons the decision of the district court is affirmed.

*Judgment accordingly.*