**John B. HARALSON, et al., Plaintiffs,**

v.

**FEDERAL HOME LOAN BANK BOARD, et al., Defendants.**

**Civ. A. Nos. 86–1218, 86–1270.**

United States District Court, District of Columbia.

Jan. 13, 1987.

Stephen D. Susman, Randall W. Wilson, Susman, Godfrey & McGowan, Houston, Tex., Judah Best, Ronald S. Cooper, Howard H. Stahl, Steptoe & Johnson, Washington, D.C., for plaintiffs.

Kirk K. Van Tine, Baker & Botts, Washington, D.C., William K. Black, Paul W. Grace, Peter A. Moir, Federal Home Loan Bank Bd., Washington, D.C., for defendants.

## MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

Plaintiffs in this action are the Mercury Savings Association of Texas, the Ben Milam Savings and Loan Association [1] ("Mercury", "Milam", or collectively "the Associations"), and John B. Haralson, who owns 100 percent of the outstanding stock of both associations. Defendants are the Federal Home Loan Bank Board ("FHLBB" or the "Bank Board" or the "Board") and the Federal Savings and Loan Insurance Corporation ("FSLIC").[2] Plaintiffs' complaint contains five separate counts all of which arise from the FHLBB's appointment of a conservator for the Associations.

*Count 2—Breach of Contract*

Count 2 of the complaint alleges a claim for breach of contract against the federal defendants, the FHLBB and FSLIC. Presently before the Court is defendants' motion for summary judgment on Count 2, Count 4, Count 5, and Count 6, and plaintiffs' cross motion for summary judgment.[3] For the reasons explained below, defendants' motion for summary judgment has been granted, and plaintiffs' cross motion for summary judgment denied as to Count 2, Count 4, Count 5, and Count 6.

The facts relating to Count 2 are not disputed. Both parties have moved for summary judgment, therefore indicating that summary judgment is appropriate and that there are no material facts in dispute. The events which led to the appointment of a conservator are quite lengthy and detailed. As those factual events are fully

1. Two separate actions originally filed by the Associations have been consolidated in the present action. "Haralson" will collectively refer to the plaintiffs.

2. The Texas Savings and Loan Department was initially named as a defendant in the complaint. It has since been dismissed.

3. While plaintiffs' cross motion for summary judgment is not limited to only Count 2 as defendants' is, this Court, for the sake of clarity, will treat both plaintiffs' and defendants' motions for summary judgment separately for each count of the complaint.

set out in the voluminous pleadings and exhibits submitted by the parties, this Court will not attempt to repeat any but those crucial to an understanding of the legal issues involved here.

On January 29, 1986, the Bank Board served on the Associations a Notice of Charges and Hearing ("Notice") and a Temporary Cease and Desist Order ("Temporary CD"). The Notice listed numerous violations of the Bank Board's regulations and the accompanying Temporary CD placed immediate operating restrictions on the Associations. The Temporary CD prevented the Associations from engaging in future practices that were similar to the past violations described in the Notice. Plaintiffs filed a complete and timely answer to these charges. Plaintiffs also prepared to exercise their statutory right to immediate judicial review of the Temporary CD.

Instead, on February 7, 1986, after negotiations between the Bank Board and counsel for the Associations, the Bank Board and FSLIC entered into a written contract with the Associations, formalized in two documents entitled the Interim Undertaking ("Undertaking") and the Stipulation Regarding Interim Undertaking ("Stipulation"). It is the construction of that contract which is now at issue.

Like the Temporary CD, the Undertaking basically restricted the type and size of loans the Associations were allowed to make, required specific documentation for making new loans and funding advances on existing loans, and limited the payment of compensation, fees and bonuses to officers, directors and employees of the Associations. The Undertaking also restricted the Associations from engaging in transactions with certain specified parties. Affirmative obligations were placed on the Associations to furnish certain information to the Bank Board, to review loan files to ensure that all necessary documentation existed with respect to certain transaction, and to review compensation levels of officers and directors of the Associations.

A comparison of the Undertaking with the Temporary CD reveals that the Under-taking is closely modeled after the Temporary CD. In several instances, however, the restrictions of the Undertaking are significantly more lenient than those in the Temporary CD. (For example, the Temporary CD required a written business plan that included maximum dollar volume of growth in savings capital on a monthly basis, while the Undertaking required it only on a quarterly basis.) Overall, the Undertaking is less restrictive than the Temporary CD in areas such as directors and officers compensation, reporting requirements, lending practices, and the Associations' freedom to deal with certain specified persons.

The Associations had a statutory right under the Home Owners' Loan Act of 1933, 12 U.S.C. § 1464(d)(6)(A) (1982), to judicial review of the imposition of the Temporary CD. This was a significant difference from the Associations' rights pursuant to the Undertaking. As part of the Stipulation, the parties agreed to "waive the right to seek judicial review of the issuance of the Undertaking under the provisions of the NHA [National Housing Act] or other applicable law." Stipulation Para. 6.

A means of enforcement of the Undertaking was also provided for in the Stipulation. It was agreed that an injunction "is the exclusive remedy for violations by the Associations of the Undertaking." Stipulation Para. 5. The parties agreed to be bound by the provisions of the Undertaking in exchange for which the Temporary CD would be withdrawn.

Under the Stipulation, Haralson was afforded an administrative hearing. This was the same hearing that was provided for in the Notice. At the administrative hearing the Associations would have the opportunity to confront the charges asserted by the Bank Board against the Associations. That hearing was scheduled for March 17, 1986. As late as March 13, 1986, the Bank Board advised Haralson of its intention to proceed to the administrative hearing.

On March 13, 1986, the Acting Director of FSLIC, the Acting Director of the Bank Board's Office of Examinations and Super-

vision, and the Acting General Counsel of the Bank Board jointly submitted two Issue Memoranda to the Bank Board summarizing the alleged facts which composed the statutory grounds for the proposed appointment of FSLIC as Conservator for Mercury and Milam. The Issue Memoranda cited and explained materials in the administrative record the Bank Board staff had compiled concerning the financial condition of the Associations.

The next day, on March 14, 1986, the Bank Board met and by formal resolution consumated its decision to impose a conservatorship on the Associations. The Bank Board staff referred the Bank Board to the materials in the administrative record which demonstrated that statutory grounds to appoint a conservator were met, in that the Associations were insolvent, and had suffered a substantial dissipation of assets due to regulatory violations and unsafe and unsound practices. The Resolutions the Bank Board adopted that day expressly suspended the Undertaking. The administrative hearing scheduled for March 17, 1986, was not held.

The Undertaking and the Stipulation are silent with respect to the Bank Board's power to appoint a conservator. Neither document makes any reference to any of the statutory grounds for appointment of a conservator. The only expression in the documents relating to the Bank Board's enforcement power is in paragraph 5 mentioned above, which provided for injunctive relief for violations of the Undertaking. There is no indication, however, that the Bank Board relied on, or was informed of, any violations of the Undertaking in connection with its decision to appoint a conservator. No such violation has been asserted by the Bank Board.

In his complaint, Haralson alleges that the Bank Board breached its contract with the Associations "[by] appointing a conservator rather than proceeding in accordance with § 407(f)(3), *for alleged actions subject to the Stipulation Regarding Interim Undertaking....*" [4] Complaint at 19 (emphasis added). The contract is construed by

Haralson to contain a limitation on the Bank Board's enforcement powers prior to an adjudication of the charges set out in the Notice at the scheduled administrative hearing.

In Haralson's memorandum, however, his argument is significantly different. There, Haralson alleges that "by suspending the Interim Undertaking and cancelling the administrative hearing, the defendants breached the terms of the Stipulation." Plaintiffs' Opposition to Defendants' Motion for Partial Summary Judgment at 8–9. Haralson no longer contends that the imposition of a conservator was based on a violation of the Undertaking, as he did in his complaint, where he refers to "actions subject to the Stipulation".

The Bank Board agrees that an injunction would have been the sole remedy for a violation of the terms of the Undertaking, but the Board maintains that their decision to appoint a conservator was not based on a violation of the Undertaking. Rather, it was based on a finding that three separate statutory grounds for appointment of a conservator (insolvency, dissipation of assets, and unsafe and unsound conditions) existed. As construed by the Board, the contract does not impose any restriction on the Bank Board's pre-existing power to appoint a conservator where the appointment is based on the independent existence of the grounds enumerated in the statute.

The question before this Court then, is whether the parties contractually agreed that the Bank Board would relinquish its statutory authority to impose a conservatorship, on any and all grounds whatsoever, until the conclusion of the administrative hearing provided for by the contract. If no such promise was made by the Bank Board, there could have been no breach.

■ "The judicial task in construing a contract is to give effect to the mutual intentions of the parties." *NRM Corp. v. Hercules Inc.,* 758 F.2d 676, 681 (D.C.Cir. 1985) (footnote omitted). *See also Deauville Corp. v. Federated Department Stores,* 756 F.2d 1183 (5th Cir.1985). In-

---

**4.** § 407(f)(3) of the National Housing Act, 12   U.S.C. § 1730(f)(3) (1982).

tent is considered from an objective standard and is evidenced from the words of the contract itself. The subjective intent of the parties is not controlling.

■ Both parties concede that the language of this contract is unambiguous. "Where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties." *NRM Corp.*, at 681. Accordingly, there is no need for this Court to look to extrinsic evidence of intent to guide the interpretive process. *Id.*, at 682.

Although there is disagreement between the parties as to the meaning of the contract, it "is not ambiguous simply because the parties disagree on its interpretation." *Papago Tribal Utility Authority v. FERC*, 723 F.2d 950, 955 (D.C.Cir.1983). The parties disagreement may stem from a difference in their subjective understanding of what they agreed to. However, even if Haralson subjectively thought that the Bank Board agreed to relinquish its ability to impose a conservator, this Court is compelled to determine what a reasonable person would have intended in entering into this agreement.

■ Our inquiry begins with an examination of those portions of the language of the contract about which there is a dispute. *Paragraph 4* of the Stipulation states as follows:

FSLIC and the Associations stipulate and agree that the attached Undertaking shall remain in effect pending the completion of the administrative proceeding provided for in the Notice, and until such time as the charges specified in the Notice are dismissed by the FSLIC or until the FSLIC shall issue a cease-and-desist order at the completion of the administrative proceeding or the Undertaking otherwise terminates pursuant to paragraph 19 of the Undertaking.

*Paragraph 5* of the Stipulation provides:

FSLIC and the Associations stipulate and agree that the FSLIC has the power to seek an injunction in accordance with the provisions of Section 407(f)(3) of the NHA, 12 U.S.C. § 1730(f)(3) (1982), and that this is the exclusive remedy for violations by the Associations of the Undertaking.

*Paragraph 19* of the Undertaking provides:

This Undertaking shall terminate at such time as the charges specified in the Notice of Charges and Hearing against Mercury and Ben Milam are dismissed by FSLIC; the FSLIC shall issue a cease-and-desist order at the completion of the administrative proceeding initiated by the Notice; or otherwise in accordance with law. This Undertaking shall also terminate (with respect to the Association acquired) upon the acquisition by any person other than J.B. Haralson, in accordance with the provisions of 12 U.S.C. § 1730(q) (1982) or 12 U.S.C. § 1730a (1982) and 12 C.F.R. Part 574, of 100% of the stock of Mercury or Ben Milam owned by J.B. Haralson.

Haralson contends that in exchange for giving up the right to seek immediate judicial review of the Temporary CD, the defendants agreed to limit their enforcement powers to either: (1) injunctive relief under paragraph 5 of the Stipulation for violations of the Undertaking's restrictions on the Associations; or (2) the imposition of a cease-and-desist order upon completion of the administrative hearing provided for in paragraph 4 of the Undertaking. Although the contract is silent with respect to the Bank Board's ability to impose a conservator on statutory grounds, Haralson contends this restriction can be implied from a reading of the contract as a whole.

Haralson interprets the contractual language specifically quoted above to mean that the Undertaking can terminate only in two possible ways. First, the administrative hearing can be held at which the associations will either prevail and the charges be dismissed, or the Bank Board will prevail and enforcement action will be taken against the associations. Second, Haralson can sell his stock in the associations to someone else. Absent either of these two events, a termination of the Undertaking constitutes a breach of contract.

The Board contends that they always had statutory power to impose a conservator. Since the contract is silent with respect to that power, it was not bargained away by the Bank Board in the contractual agreement with the Associations, either expressly or impliedly. The Bank Board contends that they were not contractually precluded from exercising this power, therefore there was no breach of contract in so doing. The appointment of a conservator was an action by the Bank Board that was in accordance with law assuming, *arguendo*, that the statutory grounds were met.

Moreover, defendants' interpretation of the above quoted language adds a third possible way to terminate the contract. Paragraph 4 of the Stipulation is read to state that the Undertaking remains in effect pending the administrative hearing, or until the Undertaking terminates pursuant to Paragraph 19 of the Undertaking. The portion of Paragraph 19 referred to is the "otherwise in accordance with law" language. The appointment of a conservator by the Bank Board merely resulted in a termination of the Undertaking "in accordance with law" as provided for in Paragraph 19 of the Undertaking. Since the Undertaking terminated as provided by its terms, there was no breach.

This Court must agree with the Bank Board's interpretation of the language of the contract. The reasons for this are several. The plain language of paragraph 5 of the Stipulation, which is the only portion of the documents which expressly addresses the defendants' enforcement powers, refers only to violations of the Undertaking itself. It does not address other activities by the Associations which might violate some other regulatory prohibition or requirement. Had the parties intended to limit the defendants' regulatory enforcement powers further, they could have expressly so stated.

Haralson suggests that in order to give meaning to the contract this Court ought to find a restriction on the Bank Board's ability to impose a conservatorship by necessary implication. Any other reading of the contract, according to Haralson, would render it meaningless. As an example, Haralson asks what would, under the defendants' interpretation, prevent the Bank Board from imposing another Temporary CD immediately after the Undertaking was executed? The answer to that question is simple. If the basis for the Temporary CD was the same as any of the charges included in the Notice, the Bank Board was contractually precluded from taking such action by Paragraph 5. If there were some new activity by the Associations which formed the grounds for the Temporary CD, the Bank Board would have the power to take enforcement action. That is what happened here.[5] Thus, the Bank Board's promise to refrain from further enforcement action relates only to the activities restricted by the Undertaking.

The Court "must ascertain the intent expressed in the writing by looking ... [at] the circumstances surrounding its execution." *Deauville*, at 1193. The circumstances here indicate that even without implying a restriction on the Bank Board's power, the contract contained a *quid pro quo*. Haralson gave up his right to immediate review in exchange for terms in the Undertaking which were significantly less restrictive than those imposed by the initial Temporary CD.

As for the Bank Board's ability to terminate the Undertaking by imposing a conservator, the plain language of paragraphs 4 and 19 again lead us to agree with the interpretation of the contract propounded by the defendants. While those paragraphs are not as clearly drafted as they might have been, they do indicate that the Bank Board had the ability to terminate the Undertaking in any manner that was in

---

**5.** There is a slight difference here from the above example in that the Associations did not affirmatively take any action which changed the *status quo*, rather it was the change in the applicable regulations which resulted in the existence of the statutory grounds to appoint a conserva-tor. The Court at this time does not reach the question of whether those changed regulations will support the Bank Board's action, but assumes that they do for the purpose of this motion.

accordance with law, as the appointment of a conservator was.

To accept Haralson's interpretation of those paragraphs would mean that an administrative hearing would have to be held even before Haralson would have been able to sell his stock in the Associations. That anomolous result could not have been the intent of the parties, and that interpretation must be rejected. Haralson was represented by counsel when the documents in question were drafted. It was incumbent upon his counsel at that time to negotiate with FSLIC over the inclusion of the phrase "or otherwise in accordance with law" if they so chose. This Court will not rewrite the contract for the parties at this time.

*Count 4—Fraud and Denial of Due Process*

A. Fraud

■ Count 4 of plaintiffs' complaint states a claim for fraud and denial of due process. It is alleged that FSLIC fraudulently induced Haralson to forgo his right to seek judicial review of the Temporary CD and induced him to enter into the Undertaking and Stipulation by agreeing to withhold regulatory action, when FSLIC and the FHLBB did not intend to comply with the terms of that contract. Haralson allegedly relied on that misrepresentation to his detriment.

Defendants argue that the Undertaking and Stipulation imposed no limitation on the Bank Board's ability to appoint a conservator so that there cannot have been a fraudulent intent not to comply with a nonexistent limitation. It is pointed out by defendants that Haralson does not contend that he relied on any representation by defendants other than those expressly made in the contract itself. Any promise by defendants not to impose a conservator must have been made in the contract, if at all.

This Court must agree with the defendants that there could not have been any fraud. Although we are cognizant of Haralson's contention that the Bank Board had a hidden agenda and planned to appoint a

conservator even while negotiating the Undertaking and Stipulation, the defendants' intent is legally irrelevant unless the Bank Board was contractually bound not to appoint a conservator. Having found no such obligation created by the contract, Haralson's fraud claim is unfounded.

B. Due Process

Haralson also claims in Count 4 that his right to due process was denied as a result of the appointment of a conservator. Due to the appointment, he claims he was denied both the statutory right to seek prompt judicial review of the imposition of the Temporary CD, and the March 17 administrative hearing provided for in the Undertaking.

■ Haralson voluntarily bargained away his right to immediate judicial review of the Temporary CD in exchange for the more favorable terms of the Undertaking. Haralson could have chosen not to enter into the contract. He then would have retained his right to judicial review under 12 U.S.C. § 1730(f). This statutory right to review was not denied by defendants but by Haralson's own choice.

■ The defendants were not contractually bound to provide an administrative hearing prior to the appointment of a conservator. As discussed in Count 2, the contract terminated according to its own terms. The contractual right to an administrative hearing on the charges asserted in the Notice terminated along with the contract.

The right to an adversary administrative hearing prior to the appointment of a conservator is expressly denied by the relevant statute. *See* 12 U.S.C. § 1464(d)(6)(A) (1982). The constitutionality of the Bank Board's *ex parte* appointment of a conservator without notice of a hearing has been upheld by the Supreme Court in *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). Despite Haralson's contention to the contrary, *Fahey* is still good law. The *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), case relied on by plaintiffs is inapplicable here. *Louder-*

*mill* clarifies procedural protection afforded government employees prior to termination of their job by the Government. Policy considerations are present in the employment situation which are not present here.

Section 1464(d)(6)(A) provides for post-deprivation expedited review of the Bank Board's action, upon the merits, in the District Court, within thirty days of the appointment. 12 U.S.C. § 1464(d)(6)(A). That statutory hearing has yet to be held. As long as that hearing is held, there cannot have been any denial of due process, as that is all the process which is constitutionally due Haralson.

*Count 5—Estoppel*

■ In Count 5 of his complaint, Haralson asserts that the Bank Board is estopped from appointing a conservator. This estoppel allegedly stems from the Bank Board's representations made in the Stipulation and Undertaking[6] that the Bank Board would refrain from further enforcement action pending an administrative hearing on the charges asserted in the Notice.

Based on our findings with regard to Count 2, Haralson's estoppel claim must fail. As there was no promise or representation made to Haralson by the Bank Board in the contract, or orally, that the Bank Board would not appoint a conservator, they were not estopped from doing so.

*Count 6—Denial of Due Process*

In Count 6, Haralson alleges that his right to due process was denied, resting his allegation on several different theories. This Court will consider each of those theories in turn, although we find all of them to be without merit.

A. Attorney's Fees

Shortly before the appointment of a conservator, Haralson paid more than $1,000,000 in advance attorney's fees and expenses to his two law firms—Susman, Godfrey & McGowan ("Susman"), and Steptoe & Johnson ("Steptoe"). Those advances came from the assets of Mercury and Milam, and were paid in anticipation of the current litigation.

After seizing the Associations, defendants informed those law firms that their representation of the Associations was terminated. Defendants demanded the return of all unused retainer balances. Pending resolution of this issue, Haralson's counsel paid those balances into the registry of the Court.

Haralson argues that the termination of Susman's and Steptoe's representation of Mercury and Milam denied him of his choice of counsel. He also alleges that the statutory basis on which the Bank Board relied in taking this action does not justify it.

■ As defendants correctly point out, the Susman and Steptoe firms cannot represent both the Associations and Haralson in this proceeding. Although these parties are all nominally plaintiffs, in effect, their interests are adverse since the Associations are no longer controlled by Haralson but are under the control of the conservator appointed by the defendant.

■ Furthermore, Haralson has not been denied his choice of counsel. Susman and Steptoe have represented Haralson prior to the institution of these proceedings and they still represent Haralson. What this Court understands Haralson to really be seeking is the payment of his legal fees from the assets of the Associations rather than his personal funds.

While 1464(d)(8)(A) provides for the award of attorney's fees to a prevailing party in a section 1464 action, Haralson has not yet prevailed on the merits of this action. He therefore has no claim to legal fees at this time. Should he be successful and regain control of the Associations he will be able to cause the Associations to reimburse his personal debt at that time.

■ The statutory argument made by Haralson is also to no avail. Section 1729(b) authorizes the conservator to "take

---

**6.** Haralson concedes that there were no oral representations made to him by the defendants

on which he relied. *See* Transcript of July 10, 1986, at 10.

over the assets of and operate such association ..." and to "take such action as may be necessary to put it in a sound solvent condition...." 12 U.S.C. § 1464(d)(8)(A). Section 1464(d)(6)(D) provides that "a conservator shall have all the powers of the members, the directors, and the officers of the association...." *Id.* Thus, it is the conservator and not Haralson who has the authority to hire and fire counsel for the Associations after the imposition of the conservatorship.

### B. Denial of the March 14 Administrative Hearing

Haralson's next argument that his right to due process has been denied is merely a repetition of the claim he made in Count 4. Haralson again argues that he has been denied a hearing in which he can challenge the basis for the Bank Board's action. This Court has found that Haralson's right to a hearing has not been denied. Haralson will have the opportunity to contest the Bank Board's action before this Court. Given the public interest in the maintenance of stability in this country's financial institutions, this post-deprivational hearing adequately protects Haralson's property interest. *See Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947).

### C. The Burden of Proof

▮ Finally, Haralson claims that the Bank Board's actions have resulted in an unconstitutional shift in the burden of proof. At the March 17 administrative hearing, according to Haralson's argument, the Bank Board would have had the burden of proving the allegations made against the Associations. In a § 1464 action, Haralson asserts that defendants argue he will have the burden of proving that the Bank Board acted arbitrarily and capriciously on the basis of the administrative record. This Court rejects defendants' argument, how-

ever, that the burden of proof is on Haralson to show that based on the proferred administrative record created by the Bank Board the Board's action was unlawful.

In this case, there has been no administrative hearing and the only administrative record for this Court to review is that created *ex parte* by the Bank Board. In this situation, the language and purpose of Title 12 require this Court to conduct review "upon the merits". There has been some disagreement as to the proper meaning to accord that phrase, and the Court of Appeals for the District of Columbia has provided no definitive answer. However, this Court adopts the position taken by the District Court in *Collie v. FHLBB,* 642 F.Supp. 1147 (N.D.Ill.1986) with regard to this issue. *Accord Fidelity Savings & Loan Ass'n v. FHLBB,* 540 F.Supp. 1374 (N.D.Cal.) rev'd on other grounds, 689 F.2d 803 (9th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); *Telegraph Savings & Loan Ass'n v. FSLIC,* 564 F.Supp. 862 (N.D.Ill.1981) aff'd sub. nom. *Telegraph Savings & Loan Ass'n v. Shilling,* 703 F.2d 1019 (7th Cir.), *cert. denied,* 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 681 (1983).[7]

Support for this position can be found in the statutory scheme itself. The sections of Title 12 dealing with temporary and permanent cease and desist orders both require that an administrative hearing be held and a record of the hearing be created. At that hearing, the burden is on the Bank Board to come forward with evidence sufficient to support a finding that a violation has been established.

Section 1730(j) governs hearings and judicial review. That section incorporates by reference the standards of review established in § 706 of the APA. Once there had been an administrative hearing, the

---

7. Defendants' reliance on *Guaranty Savings & Loan v. FHLBB,* 794 F.2d 1339 (8th Cir.1986) is misplaced. The *Guaranty* court points out that *de novo* review is authorized where agency action is adjudicatory in nature and the agency's factfinding procedures are inadequate. The plaintiffs in *Guaranty* did not claim that the agency factfinding was inadequate so the *Guar-*

*anty* court declined to address the exceptions to the general rule proscribing *de novo* review of agency decisions. *Guaranty* at 1342, n. 5. Haralson has claimed that the facts found by the agency were not only inadequate but were purposely contrived in order to find that the statutory grounds to impose a conservator were met.

record is reviewed by the Court under the standards of § 706. Since the administrative hearing is adversarial in nature, the substantial evidence test would be used. Since the Bank Board would have had the burden of proof at the administrative hearing, unless the record is supported by substantial evidence to support the Board's action, the reviewing Court could appropriately reverse it.

The imposition of a receiver or conservator is governed by § 1729 and § 1464. Section 1464 allows a plaintiff to seek an "order requiring the Board to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver." § 1464(d)(6)(A). No express provision for an administrative hearing is made, as it is in the other sections of the statute.

As explained at length by the *Collie* court, Congress purposely provided for review upon the merits as opposed to on the record. In a case such as this one, there may not have been an earlier administrative hearing, thus no administrative record would have been developed. While, as here, there might be an 'adminstrative record' offered by the Board, that record was not made at a hearing before an impartial tribunal at which both sides had the opportunity to develop the record and present evidence.

Review upon the merits, rather than on the record, allows for the initial development of evidence to occur at trial in federal court. It also ensures that some initial showing of validity of the deprivation imposed by the Government be made. *See Comm'r v. Shapiro*, 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976). As in all instances under Title 12 where the Bank Board takes enforcement action against a party, the Board must present evidence sufficient for the Court to find the statutory grounds to impose a conservator have been met. The Association will have the opportunity to rebut this evidence and challenge the assertions made by the Board at trial.

To provide any less an opportunity for development of the facts leading to the imposition of the conservator would violate due process. It cannot be that Congress intended procedural protections that are more protective to attach to lesser enforcement actions than those provided for the most severe enforcement power granted the Board. In fact, that Congress omitted reference to an administrative hearing in § 1464 may indicate that the greater procedural formality and inherent protections the federal court were desired in cases of conservatorship.

Judicial economy allows for some flexibility in those cases, unlike this one, where there has been a prior administrative hearing, for example, as the result of a challenge to the imposition of a cease and desist order prior to a conservatorship. Where there has already been an administrative hearing, a complete duplicity of effort is not required, yet even in that instance the Court has discretion to provide both parties the right to develop the judicial record beyond the administrative record.

The Bank Board would have had the initial burden at a hearing to review the imposition of the Temporary CD or at the March 17 administrative hearing. The Bank Board will also have that burden at the trial to be held before this Court on whether the statutory grounds to impose a conservator were met. There has, therefore, been no shift in the burden of proof and no denial of Haralson's right to due process.