David L. Paul Commissioner Division of Savings and Loan State of Colorado 1560 Broadway, Suite 705 Denver, Colorado 80202
Dear Mr. Paul:
This opinion letter is in response to your November 1, 1988, letter in which you inquired about the applicability of §18-5-210, C.R.S. (1986) to savings and loan associations operating in Colorado. Section 18-5-210 prohibits an officer, manager, or other person participating in the management of a financial institution from knowingly receiving or permitting receipt of a deposit if he or she knows that the institution is insolvent.
QUESTIONS PRESENTED AND CONCLUSIONS
Your request for an attorney general's opinion presents the following questions:
1. Whether officers and managers of an insolvent federally-chartered savings and loan association may be criminally prosecuted by the State under § 18-5-210, C.R.S. (1986) for accepting deposits?
No.
2. Whether officers and managers of an insolvent state-chartered savings and loan association may be criminally prosecuted by the State under § 18-5-210, C.R.S. (1986) for accepting deposits?
 Yes, unless they are doing so pursuant to the terms of an agreement, authorized by federal law, between the institution and the Federal Home Loan Bank Board.
ANALYSIS
1. A dual banking system, consisting of state and national banks and state and federal regulatory authorities, has been in existence in the United States since 1791, when the First Bank of the United States was chartered. Competing state and federal interests have caused significant changes through the years, but states have traditionally had a significant role in the regulation of banks and other financial institutions.See National State Bank v. Long, 630 F.2d 981
(3d Cir. 1980).
Laws passed by Congress in the early 1930s established the current structure of federal regulatory authority over savings and loan associations. In 1932, the Federal Home Loan Bank Act, codified at 12 U.S.C. §§ 1421 to 1449 (1982), created the Federal Home Loan Bank Board (hereinafter "FHLBB") and established a hierarchial federal system to supervise the savings and loan industry. The system consists of the FHLBB, regional Federal Home Loan Banks, and the Home Loan Banks' member institutions, which may be federally-chartered or state-chartered savings and loan institutions. In 1933, The Home Owners' Loan Act, codified at 12 U.S.C. §§ 1461 to 1470 (1982) (hereinafter "HOLA"), authorized the FHLBB to provide for the organization, incorporation, examination, operation, and regulation of federal savings and loan associations. In 1934, The National Housing Act, codified at 12 U.S.C. §§ 1701 to 1706 (1982), created the Federal Savings and Loan Insurance Corporation (hereinafter "FSLIC") and placed it under the authority of the FHLBB. The FSLIC insures funds deposited with all federally-chartered savings and loan associations and those state-chartered savings and loan associations which elect to become insured,[1] and administers insurance payouts and liquidation procedures if an insured institution fails.
The FHLBB was given authority to issue rules and regulations which it deemed necessary to carry out the purposes of the National Housing Act. See 12 U.S.C. §§ 1725(a), 1730 (e) and (m) (1982). The FHLBB has, in fact, promulgated a great many regulations concerning the operation of savings and loan associations. One such regulation, which deals with regulatory capital requirements, provides:
 Failure to meet regulatory capital requirements. If an insured institution fails to meet the regulatory capital requirement set forth in paragraph (b) of this section, the [Federal Savings and Loan] [C]orporation may, whether through enforcement proceedings or otherwise, require such institution to take one or more of the following corrective actions:
 (1) Increase the amount of its regulatory capital to a specified level or levels;
 (2) Convene a meeting or meetings of its board of directors with the Director, Office of Examinations and Supervision, or his designee, for the purpose of accomplishing the objectives of this section;
 (3) Reduce the rate of earnings that may be paid on savings accounts;
 (4) Limit the receipt of deposits to those made to existing accounts;
 (5) Cease or limit the issuance of new accounts of any or all classes or categories, except in exchange for existing accounts;
 (6) Cease or limit lending or the making of a particular type or category of loan;
 (7) Cease or limit the purchase of loans or the making of specified other investments;
(8) Limit operational expenditures to specified levels;
 (9) Increase liquid assets and maintain such increased liquidity at specified levels; or
 (10) Take such other action or actions as the Corporation may deem necessary or appropriate for the protection of the Corporation, the insured institution, or depositors or investors in the insured institution.
12 C.F.R. § 563.13(d) (1988).
The FHLBB interprets 12 C.F.R. § 563.13(d) (1988) as providing it with the authority to enter into supervisory agreements with federally-chartered or FSLIC insured, state-chartered savings and loan associations which have failed to comply with the regulatory capital requirements of 12 C.F.R. § 563.13 and which may be insolvent. The use of these binding supervisory agreements, as an alternative to immediate closure of the institution, is common. See FSLIC v. Burdette,et al, 696 F. Supp. 1196 (E.D. Tenn. 1988); FSLIC v.Musacchio, et al, 645 F. Supp. 1053 (N.D. Cal. 1988);Haralson v. FHLBB, 655 F. Supp. 1550 (D.D.C. 1987). Under the agreement, in exchange for the FSLIC's promise to forebear from initiation of cease-and-desist proceedings, the savings and loan association consents to serious restrictions on its operations and strict supervision by the FSLIC. The savings and loan association continues to operate and is usually allowed to accept deposits (however, it agrees to use its best efforts to "discourage" the acceptance or renewal of any uninsured deposit). If the savings and loan association violates the agreement, the FSLIC proceeds with more formal actions, such as cease-and-desist proceedings. See 12 U.S.C. § 1730(e) (1982).
As stated earlier, § 18-5-210, C.R.S. (1986) provides a criminal penalty for officers, managers, or other persons participating in the direction of a financial institution who receive or permit the receipt of a deposit or investment, knowing that the institution is insolvent. A financial institution is insolvent according to § 18-5-210 when, from any cause, it is unable to pay its obligations in the ordinary course of business, or its liabilities exceed its assets.
Section 18-5-210, C.R.S. (1986) has been in existence, in varying form, since 1885. 1885 Colo. Sess. Laws 50. See alsoRobertson v. People, 20 Colo. 279, 38 P. 326 (1894). There have been some modifications of the 1885 Act between its enactment and present day, but the basic provisions of the law have remained the same: a prohibition on acceptance of deposits by an insolvent financial institution, the liability of the institution's management for such conduct, and the imposition of criminal penalties. The obvious purpose of this law, from its inception to the present, is to protect unknowing customers of insolvent financial institutions from the loss of their money. Prior to the creation of the Federal Deposit Insurance Corporation (which insures funds deposited in member banks) in 1933,[2] the FSLIC in 1934 and the National Credit Union Administration (which insures funds deposited in member credit unions) in 1934,[3] state laws of this kind were one of few measures meant to dissuade managers from putting their customers in financial jeopardy.
Officers and managers of savings and loan associations "violate" the literal terms of § 18-5-210, C.R.S. (1986) when they receive or allow the receipt of deposits, even if they do so pursuant to a supervisory agreement between the institution and the FHLBB. Questions of whether and under what circumstances § 18-5-210 is "enforceable" against such persons will turn upon whether and to what extent it is preempted by federal law or practice.
The preemption doctrine has its roots in the supremacy clause of the United States Constitution. U.S. Const. art. VI, cl. 2. When considering the possibility of federal preemption of state law, we assume that "the historic police power of the states [is] not to be superseded by the Federal Act unless that is the clear and manifest purpose of Congress." Rice v. Santa Fe ElevatorCorp., 331 U.S. 218, 230 (1947); Jones v. Roth PackingCo., 430 U.S. 519, 525 (1977). State law may be preempted by federal law in one of three ways: (1) Congress may expressly preempt state law; (2) Congress may impliedly preempt state law; or, (3) if state law actually conflicts with federal law, making compliance with both a physical impossibility or creating an obstacle to the accomplishment of federal objectives, it is preempted. E.g., Fidelity Federal Savings LoanAss'n v. De la Cuesta, 458 U.S. 141, 152-153 (1982).
Congress has not chosen to expressly preempt state law in this area. However, in my opinion, Congress has impliedly preempted § 18-5-210, C.R.S. (1986) with respect to federally-chartered savings and loan associations. In addition, because of the clear conflict between state law and authorized federal practice, §18-5-210 is preempted as to state-chartered savings and loan associations which are operating and accepting deposits under binding supervisory agreements with their federal regulators.
Federal preemption is implied when the scheme of federal regulation is so pervasive that it is reasonable to deduce that Congress left no room for state regulation. De laCuesta, supra, 458 U.S. at 153. In Easton v.Iowa, 188 U.S. 220 (1902), the United States Supreme Court considered whether an Iowa statute, which prohibited the acceptance of deposits by officers of insolvent banks and imposed criminal penalties for such conduct, could be enforced by the State of Iowa against officers of national banks. The court stated: "The national banking act and its supplements create a complete system for the government of [national banks]. Conceding the power of Congress to create this system, [the court is] unable to see how it can be regulated or interfered with by state legislation." The court held that the statute was invalid as to officers of national banks, as an attempt by the state to control national banks.
More recently, the Ninth Circuit Court of Appeals held that the procedural aspects of California's Housing Financial Discrimination Act (regulations providing for monitoring, enforcement, complaint resolution and notice) were preempted by federal law with respect to federal savings and loan associations. The court reviewed HOLA and the comprehensive regulations promulgated by the FHLBB which deal with the creation and operation of federal savings and loan associations, and concluded that the FHLBB's regulatory control over federal savings and loan associations is so pervasive that there is no room for additional control by state regulators. Conferenceof Federal Savings Loan Ass'ns v. Stein, 604 F.2d 1256
(9th Cir. 1979), aff'd mem., 445 U.S. 921
(1980).[4]
Easton and Stein make it clear that §18-5-210, C.R.S. (1986) could not be enforced by the State against officers and managers of federal savings and loan associations, due to federal preemption by implication. Congress has not impliedly preempted state law with respect to the regulation of state-chartered institutions: it has not created a comprehensive scheme of regulation of those institutions, but has recognized the authority of the states to regulate them. SeeLincoln Savings Loan Ass'n v. Federal Home Loan BankBoard, 856 F.2d 1558 (D.C. Cir. 1988). Under one circumstance, however, § 18-5-210 is unenforceable by the State against state-chartered institutions because of a conflict with federal law.
Where an agency has statutory authority to issue regulations, those regulations will preempt inconsistent state statutes.De La Cuesta, supra; Lincoln Savings Loan Ass'n, supra. The FHLBB is authorized, pursuant to 12 U.S.C. §§ 1725 (a), 1730 (e) and (m) (1982), to issue regulations such as 12 C.F.R. § 563.13(d) (1988) which, in turn, allows the FSLIC to enter into supervisory agreements with state-chartered institutions. The FHLBB has interpreted § 563.13(d) as providing it with the authority to allow such institutions to receive insured deposits. An agency's interpretation of its own regulations is entitled to great weight. See Securities Industry Ass'n. v. Board ofGovernors of the Federal Reserve System, 716 F.2d 92 (2d Cir. 1983), aff'd, 468 U.S. 207 (1984); SecuritiesIndustry Ass'n. v. Comptroller of the Currency,577 F. Supp. 252 (D.D.C. 1983), aff'd, 758 F.2d 739 (D.C. Cir. 1985), aff'd in part, rev'd in part, 479 U.S. 388
(1987).
The strict supervision and conditions imposed on the institution by the supervisory agreement, combined with the account insurance provided by the FSLIC, serve the same purpose as § 18-5-210, C.R.S. (1986): to guard against loss of funds by the institution's customers. Enforcement of § 18-5-210, C.R.S. (1986) where the institution is operating under a federally authorized supervisory agreement with FSLIC would conflict with the provisions and purposes of the federal regulation because compliance with both state law and the supervisory agreement would be a physical impossibility and compliance with state law would defeat Congressional objectives. Section 18-5-210 is therefore preempted in that situation. When, however, an insolvent state-chartered savings and loan association which is not operating under a federally authorized supervisory agreement with the FSLIC continues to accept deposits, then § 18-5-210
would be enforceable against the institution's officers and managers.
SUMMARY
The management of an insolvent federally-chartered savings and loan association may not be prosecuted by the State under section18-5-210, C.R.S. (1986) because Congress has impliedly preempted this type of state regulation of such institutions through a pervasive scheme of legislation. The management of an insolvent state-chartered savings and loan association which is operating (and accepting deposits) under a binding supervisory agreement, entered into with the FSLIC pursuant to federal law, is also shielded from prosecution by the State under § 18-5-210, due to a conflicting, superseding federal regulatory scheme. However, the management of an insolvent state-chartered savings and loan association which is not operating under a federally authorized supervisory agreement with the FSLIC and continues to accept deposits would be subject to the provisions of § 18-5-210.
Sincerely
 DUANE WOODARD Attorney General
cc: Ralph E. Mires, State Bank Commissioner Steven V. Berson, Director Department of Regulatory Agencies
BANKS AND BANKING FEDERAL PREEMPTION FRAUDS FELONY
12 C.F.R. § 563.13 (1988) 12 C.F.R. § 563.13(d) (1988)
12 U.S.C. §§ 1421 to 1449 (1982)12 U.S.C. §§ 1461 to 1470 (1982) 12 U.S.C. § 1725(a) (1982) 12 U.S.C. §§ 1730(e) and (m) (1982)12 U.S.C. §§ 1751 to 1795 (1982)12 U.S.C. § 1781 (1982)12 U.S.C. § 1811 (1982)
1885 Colo. Sess. Laws 50
§ 18-5-210, C.R.S. (1986) § 11-41-117.5, C.R.S. (1987)
U.S. Const. art. VI, cl. 2
REGULATORY AGENCIES, DEPT. Savings Loan, Div. of
Section 18-5-210, C.R.S. (1986), a criminal statute prohibiting the acceptance of deposits by an insolvent financial institution and making officers and managers of the institution liable, cannot be applied by the State to officers and managers of insolvent federally-chartered savings and loan associations due to federal preemption by implication. Section 18-5-210 is also preempted by federal law as to officers and managers of insolvent state-chartered savings and loan associations which operate and accept deposits pursuant to binding supervisory agreements, authorized by federal law, between the institution and the FSLIC. However, § 18-5-210 is not preempted and can be applied to officers and managers of an insolvent state-chartered savings and loan association which is not operating pursuant to such an agreement and continues to accept deposits.
[1] Federally-chartered savings and loan associations are required to obtain insurance from the FSLIC. State-chartered savings and loan institutions are not required by federal law to obtain insurance from FSLIC, but may be required by state law. Colorado law requires savings and loan associations to obtain insurance of their obligations, including accounts, but does not specifically require insurance by FSLIC. Section 11-41-117.5, C.R.S. (1987).
[2] 12 U.S.C. § 1811 (1982).
[3] 12 U.S.C. §§ 1751 to 1795 (1982); the statute providing for insurance of accounts appears at 12 U.S.C. § 1781 (1982).
[4] The Stein court left open the question whether the substantive nondiscrimination provisions in the California statute, which included penalty provisions, could be enforced against federal savings and loan associations by the FHLBB. InNational State Bank v. Long, supra, the Third Circuit Court of Appeals held that, although New Jersey's anti-redlining law could not be enforced against national banks by the state due to federal preemption of regulatory control of national banks, it could be enforced by the comptroller of the currency. It is, therefore, possible that the FHLBB could enforce §18-5-210, C.R.S. (1986) against insolvent federal savings and loan associations which were not operating pursuant to a supervisory agreement and continued to accept deposits.