**FIRST UNION NATIONAL BANK, Plaintiff,**

**Fleet Bank, N.A. Consolidated–Plaintiff**

**Office of the Comptroller Of The Currency, Intervenor–Plaintiff,**

v.

**The Honorable John P. BURKE, Banking Commissioner, Defendant.**

**No. 3:98CV2171 JBA.**

United States District Court, D. Connecticut.

April 7, 1999.

---

---

Donald E. Frechette, Edwards & Angell, Hartford, for First Union Natl Bank, plaintiff.

Daniel L. Fitzmaurice, Day, Berry & Howard, Hartford, for Fleet Bank, N.A., consolidated plaintiff.

F. Thomas Eck, IV, Horace G. Sneed, Comptroller of the Currency Litigation Division, Washington, DC, for Office of the Comptroller of the Currency, Office of the Comptroller of Currency, intervenor-plaintiff.

Gregory T. D'Auria Attorney General's Office, Hartford, William J. Prensky Attorney General's Office, Finance & Public Utilities, Hartford, for Banking Commissioner, Dept.of Banking, Legal Div., Ct, /o

Hon. John P. Burke Comm, defendant, John Burke, consolidated defendant.

### RULING ON INTERVENOR–PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [Doc. # 37] AND DEFENDANT'S MOTION TO DISMISS [Doc. # 41]

ARTERTON, District Judge.

These motions present the deceptively simple question of who has the authority to administratively enforce state banking laws against in-state branches of national banks. The answer requires analysis of the requirements of the national banking regulatory scheme with respect to the Connecticut Banking Commissioner's ("Commissioner") recent issuance of administrative cease and desist orders against the plaintiff banks, requiring that they cease imposing on non-depositor customers a surcharge fee for transactions at the banks' automated teller machines ("ATMs").

These now consolidated actions were originally brought by two out-of-state national banks with branches in Connecticut, joined subsequently by the Office of the Comptroller of the Currency ("OCC") whose request to file an intervening complaint was granted without objection. In its intervening complaint, the OCC claims that by the National Banking Act and related federal banking statutes, Congress intended the OCC to have exclusive administrative enforcement authority over national banks for all laws, including state banking laws related to ATM transaction fees. The OCC seeks a preliminary injunction to enjoin the Commissioner from proceeding with its pending administrative action against the two plaintiff national banks. [doc. # 37] The Commissioner seeks to dismiss the OCC's intervening complaint claiming: lack of subject matter jurisdiction, that abstention is required, that the OCC fails to state a claim, and that the regulatory scheme urged by the OCC violates the Tenth Amendment. [doc. # 41]

For the following reasons, the Commissioner's Motion to Dismiss the OCC's Intervening Complaint is DENIED and the OCC's Motion for a Preliminary Injunction is GRANTED, enjoining the Commissioner from proceeding with his pending administrative enforcement proceeding against Fleet Bank and First Union National Bank pending final disposition of the OCC's complaint. This order does not address the Commissioner's interpretation of the ATM statute in dispute, Conn. Gen. Stat. § 36a–156, nor does it preclude either the OCC from initiating its own administrative proceeding related to Conn. Gen.Stat. § 36a–156 or the Commissioner from further seeking enforcement through judicial means.

### Introduction

#### A. Prior Litigation

Although this action arises within the context of the ongoing dispute between Fleet Bank and the Connecticut Banking Commissioner over whether a national bank may impose surcharge or "convenience" fees on non-depositors who access Fleet's ATMs in the state of Connecticut, the current posture of the case raises an issue not previously before this Court or the Second Circuit in *Fleet Bank, Nat'l Ass'n v. Burke*, 23 F.Supp.2d 196, *vacated* 160 F.3d 883 (2d Cir.1998) (hereafter "*Fleet I*"): whether the Commissioner's cease and desist order unlawfully interferes with the OCC's exclusive regulatory and enforcement authority over national banks on this subject.

In *Fleet I*, Fleet sought a declaratory judgment asserting the preemptive effect of the national banking laws over the Banking Commissioner's interpretation of Conn. Gen.Stat. § 36a–156. The Second Circuit vacated this Court's ruling that interpreted state law as the predicate step for determining whether the state law conflicted with federal law so as to be preempted. The Second Circuit articulated the principle that Fleet's defensive preemption claim was inadequate to confer

subject matter jurisdiction and remanded the case for dismissal. In denying Fleet's motion for reconsideration, the Second Circuit made clear that raising the OCC's claim of exclusive authority over national banks as grounds for reconsideration "is presented too late to warrant consideration in this litigation; moreover, that claim is currently pending in separate litigation now pending in the District Court. Our opinion in this litigation is not intended to deny the District Court any jurisdiction, otherwise available over a complaint that omits a claim requiring construction of state law." *Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883 (2d Cir.1998) (order denying Fleet's petition for rehearing).

### B. Current Litigation

Immediately following issuance of the Second Circuit's decision on November 9, 1998, the Commissioner issued cease and desist orders directing Fleet, First Union and a third national bank to immediately stop imposing surcharge fees or subject themselves to fines of up to $7,500 per violation. On the same day, Fleet and First Union separately filed these actions under 42 U.S.C. § 1983, seeking injunctive relief prohibiting the Commissioner from enforcing his cease and desist order. Simultaneously, Fleet and First Union sought and were denied a temporary injunction in Connecticut superior court in which they sought to enjoin the Commissioner's temporary cease and desist orders on state law grounds expressly reserving their federal law claims for adjudication in federal district court. *See Fleet Nat'l Bank v. Burke*, 1998 WL 892258 (Conn.Super.Nov.20, 1998) (Teller, J.). After initially filing an amicus brief in this action, the OCC intervened to preserve what it claims to be its exclusive authority to enforce all banking laws, state and federal, against national banks. By agreement of all parties at oral argument, further administrative proceedings on the cease and desist orders were stayed pending the Court's ruling on the plaintiffs' motions for a preliminary injunction and the Commissioner's motions to dismiss.

### C. Overview of National Banking Regulation

#### 1. History of National Banks

Before considering the pending motions, it is informative to overview briefly the origins and history of the dual state and national banking systems in this country. This dual banking system was not the product of any deliberate or conscious power sharing effort between national and state regulators, but rather an accident of history and the result of the continuing tension between the two structures of government. *See* Friedman & Friesen, *A New Paradigm For Financial Regulation: Getting From Here To There*, 43 Md. L.Rev. 413, 416 (1984); Howard H. Hackley, *Our Baffling Banking System*, 52 Va. L.Rev. 565, 570–71 (1966). *See generally* Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L.Rev. 1 (1977).

The Supreme Court first upheld the authority of Congress to charter a national bank in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). Later, Congress provided for the chartering of national banks with the National Bank Act of 1863, to provide the nation with a stable system of currency to replace the existing system of notes issued by state banks, and to provide a ready market for the new bonds the federal government was issuing to finance the Civil War. *See* Geoffrey P. Miller, *The Future of the Dual Banking System*, 53 Brook. L.Rev. 1, 13 (1987). Indeed, those who drafted the 1863 enabling legislation thought that existing banks soon would exchange their state charters for federal charters and that a dual banking system would exist only during a brief transition period. When state banks showed a reluctance to give up their state charters, Congress imposed a punitive tax on state bank notes, a measure that failed only because banks were able to offer checking accounts as low cost substi-

tutes for the bank notes. *See Id.* Thus, "[t]he creators of the dual banking system ... were hardly bent on establishing the overlapping scheme of state and federal chartering that we observe today." *Id.* No matter its origin or intended purpose, the "dual banking system" continues to raise new issues as banks diversify their functions, expand their venues and, as illustrated in this case, incorporate new technology, such as ATMs, to expand their daily operations.

### 2. OCC as regulator of national banks

██ National banks are federally chartered under the National Banking Act of 1874 (12 U.S.C. § 21 et. seq.). Related federal banking statutes have been construed to grant the OCC broad supervisory and enforcement powers over these national banks. *See NationsBank of North Carolina v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740 (OCC "bears primary responsibility for surveillance of the 'business of banking' authorized by [12 U.S.C.] § 24 Seventh" and is "charged with superintendence of national banks" and "enforcement of banking laws"); *Clarke v. Securities Indust. Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ("the Comptroller of Currency is charged with enforcement of banking laws"). Further, the OCC is charged with enforcement of 12 U.S.C. § 36(c), the provision of the National Banking Act that permits national banks to establish and operate branches to the extent permissible for state banks under state law. *See Ind. Bankers Ass'n of New York State v. Marine Midland Bank,* 757 F.2d 453 (2d Cir.1985). As one court has observed, "the supervisory power of the Comptroller [of the Currency] extends over all aspects of a [national] bank's existence." *In re Franklin Nat'l Bank Sec. Litigation,* 478 F.Supp. 210, 217 (E.D.N.Y. 1979) (identifying the broad supervisory and enforcement powers conferred by the federal banking laws on the OCC, Federal Deposit Insurance Corporation and the Federal Reserve Board).

With narrow exception, national banks are free from "visitorial powers" except as permitted by federal law or court order. Title 12, U.S.C. § 484(a) provides:

> No national bank shall be subject to any visitorial powers except as authorized by Federal law; vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

Although the OCC is not explicitly referenced in Section 484, it has been granted administrative enforcement power under 12 U.S.C. § 1818 to issue cease and desist orders related to any national bank's violations of any "law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the bank," or to prevent any practice that the OCC deems "an unsafe or unsound practice." These "cease and desist orders have been used to regulate all areas of a bank's operations." *In re Franklin Nat'l Bank Sec. Litig.,* 478 F.Supp. 210, 217 (E.D.N.Y. 1979) (citing *Groos Nat'l Bank v. Comptroller of the Currency,* 573 F.2d 889 (5th Cir.1978); *First Nat'l Bank of Eden v. Dept. of Treasury, Office of the Comptroller of Currency,* 568 F.2d 610 (8th Cir. 1978)). In addition, the OCC is empowered to remove a national bank director or officer for violation of a cease and desist order, violation of a rule, law or regulation, participation in an unsafe or unsound banking practice and enumerated acts of dishonesty or unfitness. *See* 12 U.S.C. § 1818(e), (f), & (g). The OCC also utilizes informal procedures to obtain a national bank's compliance. *See, e.g., In re Franklin Nat'l Bank Securities Litigation,* 478 F.Supp. 210 (E.D.N.Y.1979) ("Achieving voluntary compliance with laws, recommendations and agreements is often the rule rather than the exception."); *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915

138

(1963) (noting most banks heed the "[r]ecommendations by the agencies concerning banking practices without the necessity of formal compliance procedures.").

Since *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819) and *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824), there has been some tension between the national banks' status as federal instrumentalities subject to a national scheme of federal law and regulations and the States' power to regulate the business of these national banks through state laws. As a general rule, state laws have been found applicable to national banks provided the state laws do not unfairly discriminate against national banks, favor state-chartered banks or frustrate, destroy, interfere with, or hamper national banks' exercise of their powers. *See Barnett Bank v. Nelson*, 517 U.S. 25, 33–34, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996); *Anderson Nat'l Bank v. Luckett* 321 U.S. 233, 248, 64 S.Ct. 599, 88 L.Ed. 692 (1944) ("national banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of banks' functions."). Certain provisions of the federal banking statutes explicitly subject the grant of a national bank's powers to limitations imposed by state law. For example, 12 U.S.C. § 36(c), which was amended by the Riegle–Neal Interstate Banking Act of 1994, Pub.L. 103–328, Sept. 28, 1994, now grants national banks the authority to operate interstate branches to the extent permitted under state law.[1] *See, e.g.,* 12 U.S.C. § 92(a) (the OCC may grant fiduciary powers "by special permit to national banks applying therefor, when not in contravention of State or local law"). Provisions like Section 36(c) recognize the purpose of competitive equality, namely that

national banks should not be hampered in their ability to compete with their state bank counterparts.

However, other federal banking law provisions, enumerating national banks' powers have been interpreted as allowing national banks to offer services and to compete by methods otherwise not otherwise available under state law. *See, e.g., Barnett Bank v. Nelson*, 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (concluding that a federal statute granting a national bank an authorization, permission or power "does not condition federal permission upon that of the State"); *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954) (holding that federal statute permitting national banks to receive savings deposits preempted a state statute prohibiting certain state and national banks from using the word "savings" in their advertising).

Whether state law is preempted by federal banking law is often first resolved by the OCC and is referred to as "administrative preemption." As one commentator has observed, "the decision to preempt springs solely from the agencies. Courts are thus forced to determine the acceptable scope of administrative preemption based on the legislative histories of the enabling acts, the extent of conflict between state and federal provisions, and the policy choices implicated by administrative preemption." James G. Kreissman, *Administrative Preemption in Consumer Banking Law*, 73 Va. L.Rev. 911, 929 (1987). While some in Congress have thought that the OCC's administrative preemption of state law "is inappropriately aggressive resulting in preemption of State law in situations where the federal interest did not warrant that result,"[2] that issue is

1. Although ATMs were considered branches under the prior version of Section 36(c), *see Independent Bankers Association of America v. Smith*, 534 F.2d 921 (D.C.Cir.1976) (overruling OCC's prior interpretation that ATMs established by national banks were not branches), ATMs are now explicitly excluded from

the definition of branches. *See* 12 U.S.C. § 36(j).

2. H.R. Conf. Rep. No. 103–651 at 53, *reprinted in* 1994 U.S.C.A.A.N.2068, 2074 (discussing the OCC's preemption of New Jersey state consumer protection law in the context of the impact of the Riegle–Neal Act of 1994 permit-

not directly raised thus far in this action, since the OCC does not argue that the state ATM law is preempted, but rather only it may enforce that law against national banks through its administrative action.

### Jurisdictional Challenges

The Commissioner has moved to dismiss the OCC's intervening complaint on the following four grounds: 1) this Court lacks jurisdiction over the OCC's intervening complaint in the absence of jurisdiction over the plaintiff national banks' complaints; 2) abstention is required under the *Younger* doctrine; 3) the OCC's intervening complaint fails to state a cause of action, and 4) even if the OCC does have exclusive administrative enforcement authority for Connecticut's ATM law as applied to national banks, such a role violates the Tenth Amendment.

### A. Subject Matter Jurisdiction

The Court must initially satisfy itself that it has subject matter jurisdiction over the OCC's intervening complaint before considering any request for relief based upon the merits of the case. *See Town of West Hartford v. Operation Rescue*, 915 F.2d 92 (2d Cir.1990) ("The question of subject matter must be confronted at the threshold of the case.")

### 1. Relation between jurisdiction over the OCC's intervening complaint and national banks' complaints

The Commissioner contends that if the Court lacks jurisdiction over the plaintiff banks' original complaints, it necessarily lacks jurisdiction over the OCC's intervening complaint and thus the Court must first determine whether it has jurisdiction over the banks' complaints before determining whether its jurisdiction over the OCC's intervening complaint. The Commissioner relies upon "[t]he longstanding and clear rule is that 'if jurisdiction is lacking at the commencement of [a] suit, it

cannot be aided by intervention of a plaintiff with a sufficient claim.'" *Pressroom Unions–Printers League Income Sec. Fund v. Continental Assurance Co.*, 700 F.2d 889, 893 (2d Cir.) *cert. denied* 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983) (quoting *Pianta v. H.M. Reich Co.*, 77 F.2d 888, 890 (2d Cir.1935)). *See also* 7C Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1917, at 457 (2d ed.1986) (intervention cannot cure any jurisdictional defect that would have barred the federal court from hearing the original action).

■ The Commissioner is only partially correct. While the existence of a properly asserted federal claim by the OCC does not and could not cure the absence of jurisdiction over the banks' complaint, such alleged deficiency does not divest this Court of jurisdiction over the OCC's complaint since a trial court has discretion to consider the intervenor's complaint and corresponding motion for a preliminary injunction as a separate action if jurisdiction is proper with respect to the intervenor's complaint, avoiding the unnecessary and overly formalistic procedure of dismissing the pending action and requiring the OCC to refile the matter. *See Town of West Hartford v. Operation Rescue*, 915 F.2d 92 (2d Cir.1990) (remanding intervenor's claims for discretionary consideration notwithstanding dismissal of the original plaintiff's complaint for lack of subject matter jurisdiction); 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1917 at 458–59 ("if there is an independent basis for jurisdiction with regard to the intervenor[,] the court has discretion to treat his pleading as a separate action in order to adjudicate the claims raised by him."). Therefore, while reserving judgment on the issue of its jurisdiction over the banks' complaints, the Court will treat the OCC's intervening complaint as a separate action for the purpose of considering subject matter jurisdiction.

ting national banks to establish interstate

branches).

### 2. Jurisdiction over OCC's Intervening Complaint

 In its intervening complaint dated December 1, 1998, the OCC asserts jurisdiction under 28 U.S.C. § 1331 and § 1337 as an action arising under the Supremacy Clause of the United States Constitution and federal statutes, 12 U.S.C. § 24 (Seventh) and § 484. (Interven.Compl.¶ 2). The OCC claims authority to bring this action pursuant to 12 U.S.C. § 93(d) authorizing the OCC to enforce any provision of the banking title, or any other law or regulation or any action suit or proceeding to which the OCC is a party.

In its complaint, the OCC contends that the pending enforcement action by the Commissioner directly interferes with its exclusive authority to regulate and supervise the banking activities of national banks pursuant to its "visitorial power" under 12 U.S.C. § 484. At this stage, the OCC does not challenge the Commissioner's interpretation of Conn. Gen.Stat. § 36a–156, nor its applicability to these national banks, but instead disputes the Commissioner's administrative enforcement authority to issue cease and desist orders against national banks, claiming the Commissioner's actions abrogate the OCC's exclusive administrative enforcement authority provided in 12 U.S.C. § 24 (Seventh), 12 U.S.C. § 484, and/or 15 U.S.C. § 1693(*o*).

Thus, neither interpretation of state banking law (Conn.Gen.Stat. § 36a–156), nor its preemption by federal banking law is put in issue by the OCC's complaint and motion. The narrow issue presented is whether the Commissioner's pending cease and desist order violates the OCC's claimed right of exclusive regulatory authority over these plaintiff national banks.

Exercising its discretion to consider the OCC's intervening complaint as a separate action brought under federal law, the Court concludes that it has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 to determine the OCC's claim of exclusive authority.

### B. Abstention Arguments

The Court next considers the Commissioner's contention that the Court must nonetheless abstain under the *Younger* doctrine, in that the "normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Younger v. Harris*, 401 U.S. 37, 45, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

 The test of whether *Younger* abstention is appropriate is "(1) whether there is an ongoing state proceeding; (2) whether an important state interest is involved; and (3) whether the federal plaintiff has an adequate opportunity for judicial review of his [federal] constitutional claims during or after the proceeding." *University Club v. City of New York*, 842 F.2d 37, 39 (2d Cir.1988). Although the *Younger* doctrine emerged in the context of criminal proceedings, subsequent decisions have liberally expanded it, to the point that abstention may now be proper even if the ongoing state proceeding is administrative and the plaintiff must wait for state court review to have its constitutional claim heard. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools*, 477 U.S. 619, 628–29, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986).

 The OCC argues that the Court has an unflagging obligation to exercise the jurisdiction given to it and that the *Younger* doctrine is inapplicable when the United States is a party to the action. However, the Supreme Court in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 816 n. 23, 96 S.Ct. 1236, 47 L.Ed.2d 483, expressly left open this question of "when, if at all, abstention would be appropriate where the Federal Government seeks to invoke federal jurisdiction." The OCC contends that *Younger*'s policy of avoiding conflicts between the state and federal courts is more appropriate in the case of private litigants but that by "the time the United States

brings suit in federal court against a state, any attempt to avoid a federal-state conflict would be futile." (OCC Reply Br. at 3, citing *United States v. Composite State Board of Med. Examiners*, 656 F.2d 131, 136 (5th Cir.1981) (finding abstention inappropriate where federal government sought to enjoin state authorities from taking disciplinary actions against a doctor employed by the federal government).)

In contrast, the Commissioner urges this Court to follow the Sixth Circuit's approach in *United States v. Ohio*, 614 F.2d 101, 105 (6th Cir.1979), applying the *Younger* abstention doctrine notwithstanding the presence of a federal agency as a federal plaintiff. In *United States v. Ohio*, the Government filed a declaratory action against the State of Ohio alleging that the imposition of state taxes on government contractors was improper under state law. Notwithstanding the anticipation that the issue of the constitutionality of the state tax assessments would inevitably be raised in the course of the challenge to the state tax, the Sixth Circuit found abstention appropriate under either *Pullman* and *Younger*, reasoning that the constitutional issue could be raised in the state forum and there was no indication that the United States could not intervene and raise its constitutional claims in the state proceeding. Analogously, the Commissioner argues that the "question of whether the OCC has the exclusive authority under the National Banking Act to interpret and enforce Connecticut's ATM law can be properly litigated in the presently ongoing state proceedings, either by the national banks or the OCC itself." (Def.'s Opp'n to OCC's Mot. for Prelim. Inj. at 7). *United States v. Ohio* is, however, distinguishable since the sole basis for federal jurisdiction was the status of the United States as plaintiff and the only issue raised on the face of the complaint was a challenge to the state's interpretation of state law. In

contrast, the OCC is not only the intervening plaintiff in this case, but alleges solely a federal claim—its exclusive enforcement authority under national banking law—not the state's interpretation of its banking law. Therefore, no questions of state law affect the OCC's federal claim of exclusive enforcement authority of that state law.

Moreover, the OCC is not a party to the pending administrative enforcement proceeding,[3] and neither national bank has yet raised the OCC's claim of exclusive authority as a defense in that proceeding. *See Fleet Nat'l Bank v. Burke*, 1998 WL 892258 (Conn.Super.Nov.20, 1998) (Teller, J.) (noting that national banks have "expressly reserved for federal court adjudication their federal law preemption claims and their claim that the Office of the Comptroller (OCC) has sole enforcement power over national banks' violations of regulatory requirements, and that the commissioner is deprived of any authority to issue the cease and desist order."). Although the national banks are the subjects of the pending cease and desist orders and their interest in raising the OCC's exclusive enforcement authority overlaps to some extent with OCC's claim in this action, the OCC's interest in preserving what it perceives to be its exclusive regulatory authority over national banks extends far beyond the plaintiff banks' particular interest in imposing surcharge fees, with probable ramifications beyond the current dispute, to the national regulatory scheme over national banks. *See Federal Home Loan Bank v. Empie*, 778 F.2d 1447 (10th Cir.1985) (finding the federal government's strong interest in maintaining a uniform and predictable enforcement scheme for federally-chartered savings and loan associations made abstention improper); *United States v. Village of Palatine, Illinois*, 845 F.Supp. 540, 544 (N.D.Ill.1993) (holding abstention inappropriate where the

---

**3.** The OCC filed an amicus brief in the banks' unsuccessful state court proceeding seeking a temporary injunction. The Commissioner contends that the OCC would be permitted to intervene in the state administrative proceedings under state law. (Opp'n to OCC's Mot. for Prelim. Inj. at 7).

federal government's interest in preserving fair housing throughout the United States was "much broader than those of the state court defendants."). The OCC argues that it would be futile for this Court to abstain and force it to intervene in precisely the state proceeding that it claims the Commissioner lacks authority to conduct in order to raise its claim of exclusive enforcement authority. The OCC's complaint makes no claim that the state banking law, Conn. Gen.Stat. § 36a–156, is preempted by federal law, but rather that state proceeding interferes with its exclusive regulatory enforcement authority over national banks. Without needing to resolve the larger issue of whether abstention is ever appropriate when the federal government raises a federal claim against a state in federal court, the Court finds that under these circumstances abstention is not appropriate given that the OCC is not a litigant in the pending state proceeding, its interests are broader than those of the respondent national banks, the strong federal interest in a uniform enforcement mechanism over national banks is at least as important as the State's interest in enforcing its banking laws, the OCC's interest in asserting its regulatory authority to enforce state law is not necessarily antithetical to the state's interest in insuring compliance with state law, and that the precise nature of this dispute—jurisdictional—indicates the inadequacy of the opportunity for state judicial review. Accordingly, the Court declines to abstain on these grounds.

### Preliminary Injunction Standard

Having satisfied itself that jurisdiction exists and abstention would be improper, the Court now considers whether the OCC has met the requirements for preliminary injunctive relief. A preliminary injunction "is an extraordinary and drastic remedy which should not be routinely granted." *Medical Soc. of the State of N.Y. v. Toia,* 560 F.2d 535, 537 (2d Cir.1977). Typically, the party seeking a preliminary injunction must show a risk of irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996); *Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994). However, when the preliminary injunction "seeks to enjoin government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood of success standard." *Sal Tinnerello & Sons, Inc. v. Town of Stonington,* 141 F.3d 46, 51 (2d Cir.1998). "This exception reflects the idea that government policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. U.S.,* 44 F.3d 128, 130 (2d Cir. 1995); *International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 70 (2d Cir.1996); *NAACP v. Town of East Haven,* 70 F.3d 219, 224 (1995). However, when governmental action is taken pursuant to specific regulatory authority and public interests lie on both sides, the lower standard of serious-question-on-the-merits may apply. *See Time Warner Cable of New York City v. Bloomberg, LP,* 118 F.3d 917 (2d Cir. 1997). Although there are public interests on both sides here, there are also substantial private interests that are served if the injunctive relief is issued. Under these specific circumstances, the Court will utilize the more rigorous likelihood of success standard.

The Commissioner further asserts that the preliminary injunction is mandatory in nature and therefore, the OCC must demonstrate a "substantial" likelihood of success. *See Johnson v. Kay,* 860 F.2d 529, 540 (2d Cir.1988). Given that the relief sought will not require the Commissioner to undertake any new course of conduct or positive action, but rather to refrain from proceeding with enforcement of its cease

and desist order, the Court concludes that the preliminary injunction sought is more aptly characterized as a prohibitory injunction, notwithstanding the fact that many prohibitory injunctions can easily be restated in a manner that makes them appear mandatory in effect. *See Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997); *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995) ("[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities").

## Merits of OCC Motion for Preliminary Injunctive Relief

### A. Likelihood of Success

■ The OCC claims that the pending cease and order issued by the Commissioner interferes with or violates the OCC's exclusive authority to regulate national banks through regulation and administrative enforcement actions as provided for under federal banking law. In opposition, the Commissioner maintains that: 1) the state has the implicit authority to enforce state ATM laws directly against national banks under the Electronic Funds Act, 15 U.S.C. § 1693(q); 2) ATM transactions involving non-depositors do not fall within the "business of banking," and 3) any federal regulatory scheme impairing state authority to enforce state banking laws against national banks violates the Tenth Amendment of the United States Constitution.

Therefore, in order to determine whether the OCC has shown the requisite likelihood of success on the merits, there are four key issues that require analysis:

(1) Whether the OCC has exclusive regulatory authority to enforce compliance with state law by national banks;

(2) Whether the Electronic Funds Transfer Act or any other provision(s) of the National Banking Act confer or permit other authority for state law ATM regulation;

(3) Whether ATM transactions between a national bank and a non-depositor constitute the "business of banking"; and

(4) Whether a grant of exclusive federal enforcement authority over national banks is constitutional under the Tenth Amendment.

### 1. "Visitorial powers"

The OCC contends that the pending state administrative enforcement of the Commissioner's cease and desist order represents an intrusion on its statutory visitorial and enforcement powers and does not fall within any of the narrow exceptions provided under 12 U.S.C. § 484. The Commissioner disputes the OCC's interpretation of its visitorial authority as overbroad and contrary to precedent establishing State authority to enforce state banking laws against national banks and maintains that he may directly enforce against national bank branches the state banking statute, which he interprets as prohibiting the imposition of ATM surcharge fees on non-depositors, without interfering with the regulatory and enforcement authority over national banks conferred by Congress on the OCC.

Title 12, § 484 of the United States Code states in pertinent part:

(a) No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

(b) Notwithstanding subsection (a) of this section, lawfully authorized state auditors and examiners may, at reasonable times and upon reasonable notice to a bank, review its records solely to ensure compliance with applicable State unclaimed property or escheat laws upon reasonable cause to believe that the

bank has failed to comply with such laws.

12 U.S.C. § 484.

Although section 484 does not contain an explicit grant of exclusive regulatory or visitorial power over national banks to the OCC, the OCC contends that section 484 precludes states from any visitorial power over national banks unless authorized by federal law, court order or within the narrow exception created under section 484(b).

The OCC has interpreted federal visitorial power under section 484 as extending to ensuring the bank's compliance with state banking laws. Faced with three state statutes imposing certain credit card requirements on national banks and enforceable by state agencies, the OCC concluded that it alone was vested with enforcement authority:

> The enforcement authority of the Office of the Comptroller of Currency has not been limited to the enforcement of federal law. Although states have an important interest in ensuring that their laws are obeyed, the Office of the Comptroller of Currency is the exclusive regulator of national banks. It is, therefore, the province of the Office of the Comptroller of Currency, not state regulators to examine national banks compliance with state laws. *Long,* 630 F.2d at 988. *See generally* 12 U.S.C. § 1818(b) *et. seq. Cf. Conference of Fed. Sav. & Loan Ass'n v. Stein,* 604 F.2d 1256 (9th Cir.), *aff'd mem.,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980) (federal regulator is the proper authority to enforce state laws applicable to federal thrifts. Congress has delegated to the Office of the Comptroller of Currency the authority to issue cease and desist orders and to take other enforcement actions, including levying civil money penalties, against national banks

to ensure that they comply with the laws applicable to them, including state laws. *Long,* 630 F.2d at 988–89. *See generally* 12 U.S.C. § 1818(b) *et. seq.* In light of the foregoing legal authority, the Office of the Comptroller of Currency has consistently maintained that state attempts to exercise supervisory authority over national banks are preempted. [citation to prior interpretive letters omitted].

Interpretive Letter No. 614, [1992–1993 Transfer Binder] Fed. Banking L. Rep. ¶ 83,454 (January 15, 1993).

The term "visitorial" power on which courts have based interpretations of Section 484 has deep historical roots. "At common law the right of visitation was exercised by the King as to civil corporations, and as to eleemosynary ones, by the founder or donor. In the United States the legislature is visitor of all corporations created by it, where there is no individual founder or donor, and may direct judicial proceedings against such corporations for such abuses or neglects as would common law cause a forfeiture of their charters." *Guthrie v. Harkness,* 199 U.S. 148, 156, 26 S.Ct. 4, 50 L.Ed. 130 (1905) (citations omitted). One of the earliest interpretations of the OCC's "visitorial power" within the context of section 5241,[4] the predecessor to the current section 484, stated:

> Visitation, in law, is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting its business, and enforce an observance of its laws and regulations. Burrill defines the word to mean "inspection; superintendence; direction; regulation." The exercise of no such authority is contemplated by defendants [county tax assessor]. They do not contemplate inspection, supervision, or regulation of complainant's business, or an enforcement of its laws or regulations.

**4.** "This section provides that no association (meaning national banking associations) shall be subject to any visitorial powers other than such as authorized by this title (63) or are

vested in the courts of the country." *First Nat'l Bank of Youngstown v. Hughes,* 6 F. 737, 740 (6th Cir.1881).

On the contrary, their purpose is to ascertain, in a legal way and by legitimate testimony, whether any person had, at the time mentioned, on deposit with the complainant any money subject to taxation in said county which had not been returned by the owners thereof for that purpose.

*First Nat'l Bank of Youngstown v. Hughes,* 6 F. 737, 740 (6th Cir.1881), *appeal dismissed,* 106 U.S. 523, 1 S.Ct. 489, 27 L.Ed. 268 (1883) (county tax assessor could compel bank to produce bank's records to determine whether any depositor had deposited money in bank to avoid tax liability). The OCC's concept of its exclusive enforcement authority is drawn from *Nat'l State Bank, Elizabeth, N.J. v. Long,* 630 F.2d 981 (3rd Cir.1980), in which the Third Circuit held that the state banking commissioner was precluded from enforcing the state anti-redlining law against national banks by means of a cease and desist order even though the state anti-redlining statute was not preempted by a federal anti-redlining provision. In reaching its conclusion, the Third Circuit noted:

> Questions about the applicability of state legislation to national banks must be distinguished from the related inquiry of who is responsible for enforcing national bank compliance. In analyzing the latter issue, we find that important federal interests take precedence over competing state concerns. Thus, we find ourselves unable to agree with the district court's determination that state officials have the power to issue cease and desist orders against national banks for violations of the antiredlining statute.

*Id.* at 987–88.

Recognizing the potential for state law applicability to national banks under federal regulatory control, the Third Circuit observed:

Whatever may be the history of federal-state relations in other fields, regulation of banking has been one of dual control since the passage of the first National Bank Act in 1863 .... In only a few instances has Congress explicitly preempted state regulation of national banks. More commonly, it has been left to the *courts* to delineate the proper boundaries of federal and state supervision.

*Id.* at 986 (emphasis added).

The Commissioner views *Long* as an aberration and contrary to precedent he claims recognizes state authority to enforce state banking laws against national banks. In so arguing, he relies on *Brown v. Clarke,* 878 F.2d 627 (2d Cir.1989) (suit brought by Commissioner against national bank in federal court after the OCC refused to enforce state law against national banks); *First Nat'l Bank v. Dickinson,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) (declaratory and injunctive action brought by national bank with OCC as intervening plaintiff against state comptroller following his letter "requesting" bank to cease and desist operations of services which violated state branch banking laws)[5]; *Jackson v. Valdosta,* 349 F.2d 71 (5th Cir.1965) (declaratory judgment action by state superintendent of banks seeking declaration that bank could not operate a drive-in banking facility under federal banking law that incorporates state law limits on branching laws); *First Nat'l Bank of Bay City v. Fellows,* 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233 (1917) (state commissioner could initiate a *quo warranto* proceeding in state court to test the authority of national bank to engage in trust services).

While these cases indeed involved disputes between state banking authorities

---

**5.** The national bank's request for federal injunctive relief in *Dickinson* arose after the state had "requested" the national banks to cease and desist from the disputed activity. Even though the OCC intervened to assert federal preemption of state law, nothing in

the opinion suggests that the issue of the OCC's exclusive enforcement authority was raised by the parties or even considered by the Supreme Court in its determination that the state's interpretation of its law was correct.

and national banks over the application of state law to national banks, they are all actions seeking judicial declaratory or injunctive relief, and do not involve state administrative cease and desist orders. Thus, these cases should be seen as falling within the "visitorial powers" recognized in Section 484 as "vested in the courts of justice." While these cases illustrate ways in which a state may seek enforcement of its state banking laws in either federal or state court, they do not stand for the proposition that states may directly enforce state law against national banks.

The OCC's view of its exclusive administrative enforcement authority for all banking laws, state and federal is consistent with 12 U.S.C. § 36(f), making certain types of state laws applicable to interstate branches of national banks. The Riegle–Neal Interstate Banking Act of 1994, amending section 36(c) of the McFadden Act to permit interstate branching, explicitly subjects interstate branches of national banks to "the laws of the host State regarding community reinvestment, consumer protection, fair lending, and establishment of interstate branches." 12 U.S.C. § 36(f)(1)(A). However, at the same time, Congress also made clear that "the provisions of any State law to which a branch of a national bank is subject under this paragraph *shall be enforced with respect to the such branch by the Comptroller of the Currency.*" 12 U.S.C. § 36(f)(1)(B) (*emphasis added*).

Although the legislative history of the Riegle Neal Interstate Banking Act contains some Congressional expression of concern that the OCC historically may have been too willing to find state laws

preempted and not enforceable,[6] Congress granted the OCC exclusive enforcement authority over interstate branches' compliance with state banking laws and required it to maintain a report of its preemption determinations for Congressional review under 12 U.S.C. § 36(f)(C). Although ATMs are expressly excluded from the definition of "branches" under Section 36(j), the regulatory structure of Section 36(f)(1)(B) reflects Congressional intent that the existing regulatory scheme remain unchanged in further corroboration of the OCC's view of its exclusive regulatory role.

## 2. Electronic Funds Transfer Act

The Commissioner claims that the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et. seq.* (EFTA), which specifically governs ATM transactions and thus controls the analysis,[7] preserves the state's right to enforce state banking laws against national banks where the state law is a consumer protection measure and is not inconsistent with the Electronic Funds Transfer Act. The statutory section relied on states:

> This subchapter does not annul, alter or affect the laws of any State relating to electronic fund transfers, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency. A State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection afforded by this subchapter.

15 U.S.C. § 1693(q). The Commissioner's claim of authority under the EFTA to

---

6. *See, e.g.,* H.R. Conf. Rep. No. 103–651 at 53, *reprinted in* 1994 U.S.C.C.A.N.2068, 2074 ("During the course of consideration of this title, the Conferees have been made aware of certain circumstances in which the Federal banking agencies have applied traditional preemption principles in a manner the Conferees believe is inappropriately aggressive resulting in preemption of State law in situations where the federal interest did not warrant that result.").

7. *See American Land Title Assoc. v. Clarke,* 968 F.2d 150 (2d Cir.1992) (where two statutes governing national banking conflict, the statute that addresses the matter under consideration in specific terms controls over the one that does so in a general manner unless Congress has manifested a clear intent to the contrary).

enforce Conn. Gen.Stat. § 36a–156 is based on his contention that it is a state "consumer protection" statute that affords consumers greater protection and is not inconsistent with the EFTA. He reasons that since the state ATM statute is unaffected by the EFTA, national banks that violate it cannot be said to have violated the EFTA because state law was not substantively incorporated into the EFTA and thus the OCC's EFTA enforcement authority is inapplicable.

Without conceding the applicability of the EFTA,[8] the OCC argues that the EFTA, far from displacing OCC exclusive enforcement authority, preserves federal authority to take administrative enforcement actions through cease and desist orders against national banks for violations of state law pursuant to 12 U.S.C. § 1818(b). Section 1693(*o*) of the Electronic Funds Transfer Act provides:

> Compliance with the requirements imposed under this title shall be enforced ..., *in the case of (a) national banks, and federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency.*

(emphasis added).

This OCC enforcement authority is exercised by means of cease and desist orders directed against national banks if any such institution "is about to violate, a law, rule, or regulation, or any condition imposed in writing ... or any written agreement entered into with the agency." 12 U.S.C. § 1818(b)(1). The OCC further argues that the Commissioner's position that he implicitly retains enforcement authority would render the above EFTA administrative enforcement provision nugatory. The language of the EFTA simply does not support the Commissioner's interpretation and does not contain language from which it can be reasonably inferred that Congress intended to disrupt other federal laws including the National Banking Act by an implicit reservation of the power to administratively regulate banks to the states. Thus, the Court concludes that an independent state enforcement power for state consumer protection laws against national banks cannot be read into the EFTA.

### 3. "Business of Banking"

The Commissioner next takes the position that the type of ATM transaction involving a national bank and a non-depositor falls outside "banking business," and therefore outside the scope of the OCC's exclusive regulatory authority. He analogizes the bank's ATMs used to conduct the transaction with a non-depositor to a vending machine that distributes cash instead of sodas, and thus the service has no relation to the business of banking, and constituting a matter over which he retains regulatory authority. This theory, that determination of state regulatory authority over national banks' ATM services is predicated on who accesses the national bank's branches' ATMs, is without legal authority or sound rationale. The ATM service offered to these non-depositors enables them to access their accounts at their own banks from a different geographic location and logically constitutes part of banking business. The fact that the EFTA designates the OCC as responsible for enforcing the law on national banks relative to such electronic transfers further supports the premise that such transactions may reasonably be considered the business of banking when the ATMs are owned and operated by national banks. OCC interpretative letters and regulation give further support to the inclusion of ATM related activity as within the business of banking. "The establishment of ATMs by national banks is autho-

---

**8.** Neither the Commissioner, the national banks nor the OCC has requested a determination from the Federal Reserve Board as to whether Conn. Gen.Stat. § 36a–156 qualifies as a consumer protection statute that is more protective and not inconsistent with the EFTA as contemplated by 15 U.S.C. § 1693(q). The Court need not resolve this issue to consider the Commissioner's argument.

rized by section 24 (Seventh)" since they serve as an instrumentality for performing activities that are incidental to business of banking. Interpretative Letter, No. 789, 1997 WL 402489 (finding that provisions of the Colorado state EFT Act were preempted by federal law). The OCC has also promulgated the following regulation:

A national bank may perform, provide, or deliver through electronic means and facilities any activity, function or product, or service that it is otherwise authorized to perform, provide or deliver. A national bank may also, in order to optimize the use of the bank's resources, market and sell to third parties electronic capacities acquired or developed by the bank in good faith for banking purposes.

12 C.F.R. § 7.1019.

Finally, the Commissioner's argument that these ATM services do not constitute the business of banking seems disingenuous in light of the actions of the state *banking* commissioner to enjoin fees imposed by banks on such transactions as violative of state *banking* laws.

### 4. Tenth Amendment Challenge

Lastly, the Commissioner challenges the OCC's likelihood of success on the grounds that the OCC's expansive reading of the enforcement procedures under the National Banking Act and EFTA, specifically 12 U.S.C. §§ 484 and 36(f), intrudes on Connecticut's constitutional sovereignty under the Tenth Amendment and amounts to "strip[ping] away the sovereign function of state officials to interpret and enforce state laws," thus overstepping the boundary between federal and state authority. (Def. Opp'n to OCC's Mot. for Prelim. Inj. at 3–4). In *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), the Supreme Court held unconstitutional the enforcement provisions of the Brady Handgun Violence Prevention Act requiring local chief law enforcement officers to perform background checks on gun purchasers. "[T]he whole object of the law [is] to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty ... It is the very principle of separate state sovereignty that such a law offends ...."). *Id.* at 2383. Similarly, in *New York v. United States*, 505 U.S. 144, 178, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), which found unconstitutional the "take title" provision of the Low Level Radioactive Waste Policy Amendments Act of 1985, the Court observed that "[n]o matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require states to regulate."

However, *Printz* and *New York* have no applicability to the national bank regulatory scheme, which does not compel the Commissioner to enact or enforce a particular regulatory scheme, but rather has carved out from state control supervisory authority over these federal instrumentalities. Article I, Section 8 of the Constitution authorizes Congress to establish national banks and "to enact legislation for the protection, preservation and regulation of such institutions." *Clark v. United States*, 184 F.2d 952, 953 (10th Cir.1950). Under the national banking regulatory scheme, Congress does not direct the state executive to affirmatively function in any particular way, nor does the OCC's exercise of exclusive visitorial powers over national banks preclude the state statutory enactments from being applied to national banks, provided they are not in conflict with and thus preempted by federal banking laws.

By creating such a scheme, Congress has not seized the machinery of state government to achieve federal purposes. The relegation of regulatory and supervisory authority over federal instrumentalities to a single federal regulator does not interfere with the Commissioner's enforcement of state law against state banks, does not interfere with the state's enactment of non-preempted state banking laws applicable to national banks, does not preclude

the Commissioner from seeking OCC enforcement of state laws, and expressly leaves available judicial remedies to compel national bank compliance with state law.

Accordingly, the Court finds no basis for concluding that this federal regulatory scheme over federally created instrumentalities violates the Tenth Amendment. The dual banking system is such that when the states seek to enact laws affecting national banks, they do so subject to the enforcement limitation imposed by Congress for the purpose of protecting against a state's use of its legislative authority to restrict, limit or otherwise penalize national banks.

In light of the persuasive authority that the OCC, not the Commissioner, is empowered to directly enforce state banking law against national banks through administrative orders, the federal bank regulatory structure authorized by the National Banking Act and the EFTA, and the conclusion that ATM transactions with non-depositors relate to the business of banking, the Court concludes that the OCC has demonstrated a likelihood of success on the merits of its claim that the Commissioner's cease and desist order interferes with its exclusive enforcement authority over national banks.

## B. Irreparable Harm

 An irreparable injury is one that is "actual and imminent not remote or speculative," *State of N.Y. v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 755 (2d Cir.1977), and cannot be redressed through a monetary award. *See JSG Trading Corp. v. Tray–Wrap, Inc.*, 917

F.2d 75, 79 (2d Cir.1990). The movant must demonstrate that irreparable harm is likely, not merely possible. As the Second Circuit has instructed lower courts, "we think it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable of New York v. Bloomberg, LP*, 118 F.3d 917 (2d Cir.1997).

 In its motion for a preliminary injunction, the OCC asserts that the Commissioner's pending cease and desist orders and administrative enforcement proceeding causes irreparable injury to it by causing the national banks under its supervisory jurisdiction to respond to the state and thereby interferes with and derogates the OCC's supervision of these federal instrumentalities. The potential imposition on national banks of enormous state penalties for violation of the Commissioner's cease and desist orders might negatively impact their operations and financial stability, and therefore effectively supplants the OCC's authority to oversee their financial integrity.[9] In addition, proceeding with the state administrative enforcement process would presumably require proof of violations, which implicates the Commissioner's review of records of national bank operations,[10] a visitorial power that federal law denies to states, except under narrow circumstances inapplicable in this case. Thus, the Commissioner's enforcement actions continue to displace the OCC's supervisory authority in a way that cannot be

9. Based on the plaintiff banks' estimates that between 10,000 and 15,000 non-depositors use their ATMs daily and the Commissioner's statutory authority to assess a fine of up to $7,500 per violation, the national banks face potential fines of $75,000,000 to $112,500,000 per day.

10. Although the Commissioner originally requested the national banks' records and threatened to impose the $7,500 fine per vio-

lation, in the course of these proceedings he represented his changed intent that he would not subpoena any bank records or levy any fines. His change of intent, however, underscores the infirmities in his asserted power, since to investigate violations and to appropriate penalties necessarily implicates use of visitorial powers. Without such tools, the Commissioner's enforcement power is singularly handicapped.

undone, since the exercise of such administrative authority by the Commissioner is mutually inconsistent with the OCC's exclusive authority.

The Commissioner points to the OCC's delay in requesting a preliminary injunction as undermining its claim of irreparable harm. Although the dispute over surcharge fees and the national banks first began in April 1995 when the Commissioner issued an interpretative letter to the national banks and continued when Fleet filed for injunctive and declaratory relief in January 1997, the OCC's interest in preserving its exclusive enforcement authority was not put in issue until the Commissioner issued the cease and desist orders on November 10, 1998. Since the OCC promptly sought intervention within a month, the Court does not find any delay to undermine the OCC's claim of irreparable harm. For the foregoing reasons, the Court finds that the OCC has satisfied its burden of demonstrating irreparable harm.

## C. Entitlement to a Preliminary Injunction

Finally, as the Second Circuit recently observed "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable of New York City v. Bloomberg, LP,* 118 F.3d 917 (2d Cir.1997).

In this case, however the public interests on both sides of the pending controversy are not really at variance. On the one hand, the Commissioner represents the state interest as compliance with state law by banks that operate within its borders, including protection of the State's banking consumers. On the other hand, the OCC represents the strong federal interest in maintaining a uniform national banking system. Since the OCC's complaint simply challenges *how* that law will be enforced against national banks not whether the state law prohibits the surcharge fees nor whether such a state law would be preempted by federal law, granting the injunction presumably will not change or alter the applicability of protections afforded under state law. While the Commissioner couches the public interest in terms of the non-depositors' right not to be charged a surcharge fee, this interest can be advanced as well through OCC enforcement of state law, assuming the state law in fact prohibits the surcharge fees and is not preempted by federal law permitting them, issues not addressed in this ruling. Therefore, public interest in consumer protection will not be altered by issuance of an injunction directed at who will enforce the applicable state law.

Since the two agencies' views of their respective regulatory power to enforce state law against national banks are irreconcilable, and since the OCC has shown a likelihood of success on the merits of its position of exclusive enforcement authority and has adequately shown the irreparable harm to it of ongoing state administrative enforcement proceedings, the OCC has demonstrated entitlement to a preliminary injunction prohibiting the Commissioner from proceeding with his administrative enforcement proceeding on the extant cease and desist order pending final disposition on the merits.

### Conclusion

In summary, the OCC's Motion for a Preliminary Injunction is GRANTED [doc. # 37]; and the Commissioner's Motion to Dismiss the OCC's complaint [doc. # 41] is DENIED; the OCC's motion for a temporary restraining order [doc. # 26] and the banks' respective motions for preliminary injunctions [doc. # 2 and doc. # 36] are DENIED as moot.

The Commissioner is preliminarily enjoined from proceeding with the pending administrative enforcement proceeding against Fleet Bank and First Union National Bank until final disposition of the merits of the OCC's complaint. This order

in no way precludes the OCC from initiating its own administrative proceedings related to Conn. Gen.Stat. § 36a–156, nor does it preclude the Commissioner from seeking enforcement of this state banking statute against the plaintiff national banks through the courts.

IT IS SO ORDERED.